## THE PEABODY HEIGHTS COMPANY OF BALTI-MORE CITY *vs.* WILLIAM B. WILLSON.  CHRISTIAN DEVRIES AND JOHN B. RAMSAY *vs.* JOSEPH M. CONE.

*Restrictive Covenants in an Agreement Concerning the Use of Land— Liability of Purchasers with Notice—Covenants Intended for the Common Benefit of Future Purchasers—Construction of Covenant Requiring the Designs of Proposed Buildings to be Approved by a Board of Directors.*

A purchaser who takes a conveyance of land with notice of a covenant or agreement respecting it, is bound by the terms of the covenant, even though it does not in the strict sense of the term run with the land.

The owner of a tract of land adjoining Baltimore City leased thirty-six acres of it to a corporation for ninety-nine years renewable forever with a right of redemption.   The lessor reserved to himself out of the tract a lot with a front of 400 feet, and he was also to be entitled to one-fourth of the shares of the capital stock of the corporation. At the time of the execution of the lease an agreement was made under seal between the lessor and the lessee that the following by-laws or covenants should be as fully complied with as if embodied in the lease, viz.: "1. No land to be sold or leased without a pledge to build speedily, design of buildings to be approved by directors.  2. Buildings to be 20 feet back of building line, and fronts to be orna-mented with shrubbery and flowers.  3. No nuisances, factories, lager beer saloons, &c., to be permitted; clause in deed to this ef-

fect.   4. To regulate other proceedings." The company made sundry conveyances of parts of the land, in some of which there were no restrictive covenants at all, while in others the deeds were made subject to the by-laws of the company.   After the death of the lessor, the purchaser of the 400-ft. lot reserved by him released the company from the restrictive by-laws, and the company also acquired the reversion in all of the land, thereby becoming the owner in fee. Upon a bill for a specific performance of a contract of sale against a purchaser of a lot who refused to comply with the contract because he objected to the covenant requiring a "pledge to build speedily, design of buildings to be approved by the directors." *Held*,

1st. That the question whether the said restrictions were imposed by the lessor solely for his own benefit and protection, or were meant by him and understood by the lessee to be for the common advantage of the grantees of the latter was a question of intention.

2nd. That if they were intended for the common advantage of all persons purchasing lots from the company, such purchasers and their assigns may enforce them *inter sese* for their own benefit.

3rd. That in view of the language of the covenants and the interest retained by the lessor, some of the covenants were intended not merely for the benefit of the lessor, but for the common advantage of all parties who might become grantees of the property, and that all persons coming in with notice are bound by the same.

4th. That the covenant requiring the speedy building of houses was intended to be for the benefit of the lessor and of the company, and not for the benefit of other persons, and the company being now the owner of the lessor's reversionary interest, it has the right to extend the time for building as it may deem best.

5th. That the covenant or by-law requiring the designs of proposed buildings to be approved by the directors, was intended to be for the common advantage and protection of all persons coming in or taking title under the company.

6th. That it is competent for the company in selling or leasing any part of the property to provide in the conveyance or by agreement for the erection of buildings according to a certain designated plan.

7th. That if a building which has been erected according to approved plans is destroyed, or for some other reason the owner desires to rebuild, it would not be necessary again to submit plans to the directors for their approval or to follow in all its details the original plan.   All that could be required is that the new building be equal or superior to the former in appearance, size, materials used, &c., provided it be not contrary to some express requirement or prohibition in the approval of the original plan.

8th. In the event of a dissoluton of the company and the appointment of a Receiver, the Court should either require such approval by the

directors last in office, or see that some provision be made to protect purchasers from the company by directing the Receiver to require of purchasers that they will not erect buildings inferior to those previously authorized by the directors, or adopting some of the plans approved, or in such other manner as the Court may think will best cause a compliance with the spirit of the agreement entered into between the company and its vendor, and will protect those holding title through the company.

9th. That the covenant or by-law "to regulate other proceedings" is too vague to be enforced in equity.

10th. That since the company is unable to convey the lot sold to the defendant discharged of the covenant respecting the design of the buildings, it is not entitled to demand specific performance of the contract of sale.

Appeal in the case of the *Peabody Heights Co.* v. *Willson* from a *pro forma* decree of the Circuit Court of Baltimore City sustaining a demurrer to the bill of complaint and dismissing the same.   The case is stated in the opinion of the Court.

Appeal in the case of *Devries and Ramsay* v. *Cone*, from a *pro forma* decree of Circuit Court No. 2, of Baltimore City, dismissing the bill of complaint.   The bill in this case sets forth that the plaintiffs were seized in fee of a lot of ground which had belonged to the Peabody Heights Co., and which was " conveyed by the said Peabody Heights Company of Baltimore City to a predecessor in title therein to your orators.   That the said lot of land was sold by said company subject to a restriction that the designs for buildings thereon should be approved by the directors of the said company, which restrictions fully appear from the reported case of David M. Newbold against said company, reported in the 70th volume of the Maryland Reports, to which the plaintiffs pray leave to refer.   That your orators contracted with the said defendant that they would sell the said lot of land to him, and that he would purchase the same from them for the sum of $70 per front foot, to be paid in the manner stated in the proposition of said Cone, accepted by your orators ; a copy of which is herewith filed.   That your orators sent a communication to the board of directors, re-

questing their approval of certain designs for the buildings to be erected on the lots, and a copy of the said communication is herewith filed as part of this bill. That the said board of directors, by means of certain resolutions passed by them, approved said designs, and agreed, among other things, to unite in deeds *or* leases of said lot of ground with your orators to their grantees or lessees. That after the passage of the resolutions your orators were ready to execute a deed for said lot to said Cone, and the same was prepared for execution, when they were notified by said Cone that it was useless to present the deed to him, as he would not accept it and would not comply with the terms of his contract of purchase of said lot of ground because, although willing to become the purchaser of said land upon the terms, and to improve the same according to said designs, he had been advised that the said resolutions and deed are not sufficient to relieve said lot of ground from the further burdens of said restrictions; that the said directors of the said Peabody Heights Company could not authorize him to make any change in the designs as in said resolutions stated, and that if the houses should be destroyed or removed, there would be an obligation to replace them by buildings of the same design, or that another application to approve the designs would have to be made to the directors of said company; and that hence the selling or market value of the property would be greatly lessened. Your orators further show that they desire to have said contract complied with, and they are without remedy in a Court of Law to obtain enforcement of the performance of the contract by the defendant, and are relievable only in equity."

The defendant set forth in his answer " that whilst he is willing, in the event of his becoming the owner of said lot of ground, to improve the same according to the designs mentioned in the bill of complaint and the exhibits therein referred to, nevertheless he has been advised that the approval of the designs for said buildings contained in said

resolutions, as stated in said bill of complaint, are not suf-
ficient to relieve said lot of ground from the burden of said
restrictions, because said approval allows the purchaser to
make alterations in said designs, thereby delegating to the
owner of said ground a power which no one has the authority
to exercise except the directors of the Peabody Heights
Company; and without the right to make reasonable altera-
tions in said designs, the title to said lot of ground would
be unmarketable, and this respondent would not be willing
to purchase said property.   That the title to said lot of
ground is not marketable, because, if the houses should be
destroyed or removed, they would have to be rebuilt in
accordance with designs already approved, or the owner
would have to make another application to the directors of
the Peabody Heights Company to approve of the designs
of the buildings so to be replaced.   That a bill has been
filed in this Court to have a Receiver appointed for the said
Peabody Heights Company, in order that its affairs may be
wound up and the said corporation dissolved; that if said
corporation should be dissolved there would be no one to
approve the designs for construction of buildings on said
lot of ground.   That if, on the dissolution of the said cor-
poration, there being no one to approve of designs for build-
ings, the future owners of any other portion of the Peabody
Heights Company's land could improve the same in their
own way, then the market value of the property proposed
to be sold to this respondent would be greatly lessened, as
this respondent would be bound to improve according to
certain prescribed designs, and all other owners of the Pea-
body Heights Company's land could improve with buildings
of much less value, to the great injury of this respondent."

The first case was argued before ROBINSON, C. J., BRYAN,
McSHERRY, BRISCOE, PAGE, ROBERTS and BOYD, JJ.

*M. R. Walter*, for the Peabody Heights Co.

1. The restrictive covenants in the agreements of 1870
were intended by William Holmes for his own and for his

assigns' benefit and not for the benefit of those who might subsequently become the owners of the land conveyed to the Peabody Heights Company, and as the company has obtained from the Holmes' estate a conveyance of all his reversionary interest in the 36-acre tract, and as the Kelso Home (the present owner of the 400-foot lot reserved by Holmes) has released all the property from the restrictions objected to by the appellee, the appellant can convey the lot sold him free from those restrictions. This, we think, has already been decided by this Court in the *Newbold case*, 70 Md. 499.

It is evident from the circumstances, that Holmes imposed these restrictions for the benefit of himself and of his assigns only. Holmes retained for his residence a square of ground fronting 400 feet on St. Paul street, entirely surrounded by the tract leased to the Peabody Heights Company. He held the reversion in the whole leased tract, yielding him a large annual rent, in redemption of which he was to take rents on the land after it had been improved. He reserved for himself an undivided one-fourth interest in the leased land, and provided in the agreement that he should receive for this undivided interest, if the Peabody Heights Company should be organized, one-fourth of its capital stock, which capital stock he did, in fact, receive. He required that the company should " open and develop the property as fast as may be desirable and expedient," and not to call on him for cash contributions for his share of money laid out on said property, but to charge such proportion to his account against the extinguishment of the principal of the ground rent aforesaid. Holmes' whole object being to have his own property developed and made valuable by the company, and to control improvements so far as his own interests required, the restrictions were deliberately omitted from the lease and no reference therein, whatever, made to the agreement.

Holmes, while imposing the restrictions on the property conveyed to the " Peabody," left his 400 feet free, except

that he agreed "to build a good house" on the 400 feet "as soon as practicable, setting it back 20 feet off the present building line of St. Paul street extended." He could, and his representatives or assigns can, subject to the provision requiring the buildings to be set back 20 feet, erect on that lot any kind of building or buildings of any width or of any design that might suit his or their fancy. They could and can erect any nuisance, factory or lager beer saloon. In other words, while insisting upon controlling for his own benefit the uses to which the other property could be put, he reserved the right to do whatever he pleased with his own. His 400-foot lot was surrounded on all sides by the property leased to the Peabody Heights Company, and it is certainly remarkable if he intended to benefit the future owners of the leased property the 400 feet should be left in such condition that he or any future owner of it could at his or their pleasure destroy all the benefits. It is, therefore, impossible to believe that he intended the restrictive covenants for the benefit of anyone but himself. This would be so had the agreement of 1870 been recorded, or had its provisions been incorporated in the "Peabody" lease; but when it is remembered that the agreements, after having been executed, were studiously kept from the records, that sales and leases of the land leased were made without any reference to the agreement and without notice to the vendees or lessees, there is certainly no ground upon which it can possibly be argued that Holmes had anyone's benefit in view but his own and that of his assigns. "The presumption here, as in every other case where a restriction is inserted in a deed against undesirable structures or trades, is that the insertion was for the purpose of protecting rights which the grantor had in adjacent property." *Post* v. *Weil*, 115 N. Y. 361. And if there be any doubt as to what the intention was, that doubt should always be solved in favor of the freedom of the property. *Hutchinson* v. *Ulrich*, 145 Ill. 342; *Master* v. *Hansard*, L. R. 4, Ch. D. 718; *Keates* v. *Lyon*, L. R. 4, Ch. 218; *Graham* v. *Kite*, 93 Ky. 474; *Nottingham Co.* v. *Butler*, 16 Q. B. D. 785.

2. Only those who acquired " right of title under that company with notice of the covenant," could, as this Court has said in the Newbold case, page 500, have the covenant enforced against them, and if not enforceable against them, it can, of course, not be enforced in their favor, even if it had been intended for their benefit.   As none of the company's grantees or lessees, except the last three, had any knowledge of the agreement, they are at liberty to disregard all of the restrictions except those mentioned in their respective deeds.   Therefore, not only is Holmes' assignee of the 400-foot lot on St. Paul street (the Kelso Home), at liberty to do whatever it pleases with that property, which, as already stated, is entrely surrounded by the Peabody property, but the present holders of the various lots sold by the company in different parts of the tract, who took without notice, may do likewise, except so far as restricted by their several deeds. The company can, therefore, make any conveyance free from the restrictions to which the appellee objects, so far as those who bought or leased without notice are concerned.   " When once there has been a purchaser for value without notice of the restrictions, the restrictions are gone, and a good title can afterwards be made free from them." *Nottingham Co.* v. *Butler*, 16 L. R., Q. B. Div. 787.   " The tendency of the latter decisions, both in this country and in England is, we think, to restrict rather than to extend the equitable doctrine of notice." *Kettle R. R. Co.* v. *Eastern R. Co.*, 41 Minn. 476.

In order to entitle any grantee to claim the benefit of such covenants, "it should," as was said by the Court in *Knapp* v. *Hall*, 20 N. Y. Sup. 42, 43, "be made clearly to appear" that the party "made his purchase in reliance upon the restrictions and conditions alleged."   In *Renals* v. *Cowlinshaw*, 9 Ch. Div. 130, the Court held that "to claim the benefit of a restrictive covenant, this at least, must appear that the assign acquired his property with the benefit of the covenant—that is, it must appear that the benefit of the covenant was part of the subject-matter of the purchase."

3. But even if the Court should be of opinion that the restrictions were originally intended for the benefit of the grantees or lessees of the company, and that nothing hereinbefore urged will prevent them from insisting upon their enforcement, it is respectfully submitted that only the negative covenants will be enforced.   In *Haywood* v. *Brunswick Building Soc.*, 8 Q. B. Div. 406, it was held that only covenants restricting the mode of using the land are within the rule in the leading case of *Tulk* v. *Maxhay*.   In *London, &c.*, v. *Gomm*, 20 Ch. Div. 583, JESSEL, M. R., says: "In *Haywood* v. *The Brunswick, &c.*, the Court decided that they would not extend the doctrine of *Tulk* v. *Moxhay*, to affirmative covenants, compelling a man to lay out money or to do any act of what I may call an active character, but that it was to be confined to restrictive covenants.   Of course that authority would be binding upon us if I did not agree to it, but I most cordially accede to it;" and SIR JAMES HANNEN, in the same case, says, "the Haywood case puts a wholesome restriction upon the application of *Tulk* v. *Maxhay*, by laying down the rule that it only applies to restrictive covenants, and does not apply to an affirmative covenant."   The requirements in the agreement of September 20, 1870, that the purchaser is to build speedily, and is to ornament the fronts with shrubbery and flowers, are affirmative covenants.

4. The covenant requiring the designs of buildings to be approved by the directors, is unreasonable and void.   A "design" is defined to be:   "A drawing or plan of an intended building, projected by the architect, according to the rules of art, with taste and judgment, including plans, sections and elevations."   *Stuart Dictionary of Architect*, vol. 2, page 9.   "A working plan to be used in the accomplishment of something projected, especially the plan of an architect, engineer, machinist or master of some useful art."   *Standard Dictionary of English Language.*   "A drawing from which a building or other work of art may be executed."   *Worcester's Dictionary.*   "Specifically in architecture, a plan

of an edifice as represented by the ground plans, elevations, sections and whatever other drawings may be necessary to guide its construction." *Century Dictionary*, page 1560.

It certainly seems unreasonable that a purchaser of a lot should have the right to its beneficial use only, provided the directors approve of the design (as above defined) of the improvements he proposes to erect on it. Their judgment in the matter is, by the covenant, made final, and they have practically the right to say whether it shall be improved or not. The purchaser would be the nominal owner only. The law does not sanction any convenant by the purchaser of land which deprives him substantially of the ownership.

*John F. Williams*, for the appellee, Willson.

The intention and purpose of the projectors of the Peabody Heights Company (of whom Holmes was one) was to make " Lilliendale " the ideal dwelling house neighborhood of Baltimore, and these building conditions and servitudes were imposed on said property by the projectors of said company in furtherance of said general plan or scheme. The whole property was to be bound by one general law for the benefit and protection of the company and its vendees—every one who might buy and build thereon. Therefore, it is not competent for the Peabody Heights Company, with the consent of Holmes or his assignee (the Kelso Home), to release, destroy or remove this protection from the lots already sold, by authorizing the use of the remainder of the property in any way inconsistent with the law, by which the whole was bound, and the deed from the Kelso Home, of April 25, 1889, binds no one except the grantor therein. *Washburn on Easements* (4 ed.), 115–116 ; *Parker* v. *Nightingale*, 6 Allen, 341 ; *McCarty* v. *Kitchemman*, 47 Pa. St. 239 ; *Barrow* v. *Richard*, 8 Paige, 351 ; *Peck* v. *Conway*, 119 Mass. 546 ; *Tobey* v. *Moore*, 130 Mass. 448 ; *Jeffries* v. *Jeffries*, 117 Mass. 184 ; *Herrick* v. *Marshall*, 66 Me. 435 ; *Mackenzie* v. *Childers*, L. R. 43, Ch. D. 277 ; *Spicer* v. *Martin*, L. R. 14, App. Cas. 25 ; *Equitable Life So-*

*ciety* v. *Breman*, 24 N. Y. S. 784.   Affirmed, 26 N. Y. S. 600, 74 Hun. 576.

ROBINSON, C. J., delivered the opinion of the Court.

William Holmes being the owner of a tract of land adjoining Baltimore City, containing thirty-six acres, leased the same to the Peabody Heights Company for ninety-nine years, renewable forever, upon the payment of a yearly rent of nine thousand dollars, with the right of redemption at any time within ten years, on the payment of one hundred and fifty thousand dollars.   After the execution of the lease, which is dated 14 October, 1870, but before its delivery an agreement was, on the 19th October of the same year, entered into between Mr. Holmes and the Peabody Heights Company, by which, after reciting that there were matters of detail connected with the sale and purchase of the property which could not be conveniently set forth in the lease, the parties covenanted with each other that an agreement dated 20 September, 1870, with a memorandum attached thereto dated the 13th of the same month, should be binding on them and their assigns, and " that the covenants, requirements, restrictions and reservations therein should be as fully complied with and carried out as if they had been embodied in the lease."

The memorandum of September 13th attached to the agreement purports to be and is a report to Holmes, the lessor, by his agent, Tinges, of the basis of an agreement for the sale of the property to the parties therein named, and who afterwards were to form a joint stock company.   By the terms proposed, the purchase money was not to exceed one hundred and seventy-five thousand dollars, of which sum twenty-five thousand dollars was to be paid within a stipulated time, and the balance, one hundred and fifty thousand dollars, was to be secured by a ground rent payable and redeemable in the manner heretofore set forth. Holmes reserved for himself and his heirs and assigns, out of the tract of land, four hundred feet on the west side of St.

Paul street, and agreed to build thereon a " good dwelling house as soon as practicable, setting it back twenty feet from the building line of said street." The purchasers were to form a joint stock company, with a capital of $500,000, of which Holmes was to have one-fourth interest, and to be one of its directors, so long as he retained his said interest. The purchasers were to open and develop the property as fast as practicable, but were not to call on the lessor for his one-fourth part of the expenses, but were to charge the same to his account against the unpaid portion on ground rent.

The memorandum then set forth the plan of the company, embracing its name, its object, capital stock, &c., and the following proposed " by-laws : "

No. 1. No land to be sold or leased without a pledge to build speedily ; design of buildings to be approved by the directors.

2. Buildings to be 20 feet back of building line, and front to be ornamented with shrubbery and flowers.

3. No nuisance, factories, lager beer saloons, &c., to be permitted, clause in deed to this effect.

4. "&c., to regulate other proceedings."

In accordance with the agreement and memorandum, which forms a part of it, the Peabody Heights Company was organized, and Holmes, the lessor, became the owner of one-fourth of its capital stock ; was elected one of its directors, continuing as such until his death in 1881. During his lifetime, and since his death, the company has made sundry conveyances to third parties of parts of said tract of land, in some of which there are no restrictive covenants at all, and in others, the grantees covenanted to erect no building of less than a certain number of front feet, and to build twenty feet back of the building line of the street, and not to erect any lager beer saloons, factories, &c. In two instances, one to Mrs. Polk and the other to Charles F. Pitt, the conveyances are made subject to the rules and requirements of the company in reference to the character

of the buildings to be erected as provided by the by-laws of the company.

Since Mr. Holmes' death, the square containing 400 feet on St. Paul street, reserved by him, and on which he built a dwelling house, has been sold and conveyed to "the Kelso Home" for Orphans of the Methodist Episcopal Church, without any restrictions or conditions, and that corporation, by deed 25th April, 1889, released all the land originally leased to the Peabody Heights Company, from the restrictive covenants and by-laws contained in the memorandum of the 13th September.   And on April 27th, 1893, John V. L. Findlay, trustee of the estate of William Holmes, the lessor, conveyed to the company the reversion to all the property leased to it by the lessor, thereby vesting the fee in the company.

In this state of the title, the company sold to the appellee a lot on the west side of St. Paul street, and he is willing to accept a deed with the restrictive covenants therein contained, except such covenants as require *him to "build speedily, the designs to be subject to the approval of the Directors,"* and the other *"to regulate other proceedings."*   These covenants or agreements, he contends, being made part of the lease finally executed and delivered, are binding on all purchasers with notice, and as such could be enforced by any of the grantees against the defendant or his assigns.

This is a bill filed by the company to enforce the specific performance of the contract of purchase by the defendant, and the question is whether the restrictive covenants to which we have referred impose a servitude or easement in the nature of an incorporeal hereditament on the property, which may affect the defendant's title? or in other words, whether the company can convey a title to the land sold to the defendant free and clear of the restrictions imposed as to the mode of improvement and use of the property?

When these restrictive covenants were before us, in *Newbold* v. *Peabody Heights Company*, 70 Md. 493, we said, that although the covenants or agreements were not such, strictly

speaking, " to *run with the land*," yet they were of such a
character as to create a right and equity in favor of the les-
sor and those claiming under him, which a Court of Equity
would enforce against the company and its grantees with
notice, and for the reason that one who takes an estate with
full knowledge of a covenant or agreement concerning it,
cannot equitably refuse to perform it.    And we further said,
that these restrictive covenants were in all respects legal
and such as the owner of the land had a right to impose,
and this being so, they were enforceable not only by the
owner, but by those holding under him, against the com-
pany and its lessees and grantees with notice.

The reversionary interest of Holmes in the thirty-six acres
had not been conveyed to the company when Newbold's
case was decided ; and the contention now is, that these
restrictive covenants were intended *solely for the benefit* of
Holmes and his assigns and not for the benefit of the com-
pany's grantees, and as the company has now obtained a
conveyance of Holmes' reversionary interest and as " the
Kelso Home," the present owner of the 400 foot lot, re
served by Holmes, has released all the property from the
restrictions objected to by the defendant, the company is
now in a position to convey the lot sold to him free and
discharged of the burden of such restrictions.

The question whether the restrictions were merely mat-
ters of agreement between Holmes, the lessor, and the com-
pany, imposed for his own benefit and protection, or meant
by him and understood by the lessee, for the common ad-
vantage of its grantees, is a question of intention.    If they
were intended solely for the benefit of Holmes, the grantees
of the company cannot, it is clear, claim to take the ad-
vantage of them.    And on the other hand, if they were in-
tended for the common advantage of all persons purchasing
lots from the company, such purchasers and their assigns
may enforce them *inter sese* for their own benefit.    *Notting-
ham, &c., Co.* v. *Butler*, L. R. 15, Q. B. Div. 268.    And in
ascertaining the intention of the parties in this case, we must

bear in mind that we are not dealing with restrictions imposed upon a piece of land consisting of several building lots merely, but a tract containing *thirty-six acres adjoining Baltimore City*, with some of the principal streets running through it, and as such desirable and valuable for building purposes. And such was the object for which it was bought. Before the sale was consummated, the memorandum providing for the incorporation of the company, its capital stock, by-laws and plan of the company, was submitted to Holmes for his approval. The purpose was to make the property in every way attractive and desirable for suburban and city homes, and the covenants and agreements were made in furtherance of this general plan or scheme. They required that all plans or designs for buildings should be submitted to the directors for their approval —that the buildings should be set back twenty feet from the building line with flowers and shrubbery in front, and that no buildings should be erected or used for carrying on trades that might be offensive and noxious. The object of these restrictions was to prevent the erection of buildings of any kind that might diminish the value of the property or injuriously affect it as a location for better class of dwelling houses.

Now, if Holmes had sold his entire interest in the property except the four hundred feet reserved for building a home for himself, it might be argued with some force that he was not interested in these restrictions except so far as they concerned himself and his assigns, and were therefore made for his protection and benefit. But it was made a condition of the sale and lease that he was to have a fourth interest in the residue of the entire tract, and was to be owner of one-fourth of the capital stock of the company. He was therefore equally if not more interested than his associates in whatever was for the benefit and advantage of the land leased to the company. It is clear, then, it appears to us, that looking to the memorandum and agreement, and language of the covenants, and the object and purposes for

which the property was leased, and the interest retained by the lessor in the property, that the covenants were intended not merely for the benefit of the lessor and his assigns, but for the common advantage of all persons who might become lessees or grantees of the comppany.   And such being the case, it may be considered as settled since the cases of *Mann* v. *Stephens*, 15 Simons, 370 ; *Western* v. *McDermott*, L. R 2 Ch. 72, and *Renals* v. *Cowlishaw*, L. R. 9 Chan. Div. 126, that all persons coming in with notice are bound by the covenants.

In *Keates* v. *Lyon*, L. R. 4 Ch. 218, the Court held that the sub-purchasers were not entitled to the benefit of the covenants, because it *did not appear that they had knowledge of the covenants when they became purchasers.*   In his judgment the LORD JUSTICE refers with approval to the case of *Whatman* v. *Gibson*, 9 Simons, 196, in which the VICE-CHANCELLOR said: " I see no reason why such an agreement should not be binding in equity on the parties so coming in with notice.   Each proprietor is manifestly interested in having all the neighboring houses used in such a way as to preserve the general uniformity and respectability of the row."   In *Master* v. *Hansard*, L. R. 4 Ch. Div. 718, it was held that the restrictive covenant was made for the benefit of the lessors to enable them to make the most of the property retained by them, and for the further reason, says BRAMWELL, J., " It appears monstrous to hold that this covenant, the existence of which was never communicated to the plaintiff's predecessors in title when they took their lease, is to be construed as enuring for their benefit."

So these cases cannot be said to qualify in any manner the principle laid down in *Mann* v. *Stephens*, and in other cases to which we have referred, that a purchaser taking an estate, with notice of a covenant or agreement respecting it, is bound by the terms of the covenant, even though it does not in the strict sense of the term " *run with the land.*"

We come then to the legal effect and operation of the restrictions imposed on the land leased by Holmes to the

appellant company.   By-law No. 1 provides, in the first place, that no land shall be " sold or leased without a pledge to build speedily."   In the memorandum of Sept. 13th, the parties proposing to purchase the thirty-six-acre tract agreed to develop and improve it as speedily as practicable.   The erection of attractive and comfortable dwelling houses on the several lots leased or sold, would necessarily enhance the value of the entire property, and operate to some extent as an inducement for others to purchase.   It was therefore to the interest of Holmes, the lessor, and the company, that the lots should be improved by buildings as speedily as possible.   And it was for this purpose that the first clause of the by-law was adopted.   It was intended for the benefit of Holmes and the company, and not for the benefit of other purchasers ; and the company being now the owner of Holmes's reversionary interest, it has the right to extend the time for building as it may deem best for its interests and the interests of purchasers.

The second part of the by-law provides that the design of the building shall be approved by the directors.   The object of this provision and the further provision, requiring buildings to be set back twenty feet from the building line of the street and fronts to be ornamented with shrubbery and flowers, was to secure the erection of a better class of buildings with attractive surroundings, and to prevent the erection of inferior buildings that might diminish the value of the property and affect its elegibility for building purposes. It was intended not only for the benefit of the lessor and the company, but *for the common advantage and protection of all persons coming in or taking title under the company.* And such being the case, we cannot agree with the argument, that if a building erected according to a design approved by the directors should be destroyed, the owner would have the right to rebuild without regard to the original design or in any manner he might see proper.   Such a construction would in a measure put it in the power of owners to render this restriction inoperative and of no effect, or

at least would give them the right to erect an inferior class of buildings.   They would have the right no doubt to rebuild according to the original design, and this too, with or without the approval of the directors.   And when we say, according to the original design, we do not mean that the purchaser is obliged to conform to it in every particular. As was suggested in the argument, it rarely happens that in the erection of a dwelling house, changes from the plan or design do not become necessary.   And all that could be required of a purchaser under this restriction, is that he shall not make such changes as would *substantially affect the general plan approved by the directors*.   After all, it must be borne in mind, that in administering relief in cases of this kind, Courts of Equity would be governed by equitable principles.   And although one in conveying real estate may impose certain restrictions upon its use, provided they do not deprive the owner of the beneficial use of the property, yet at the same time, Courts will always favor a liberal interpretation of the language of such restrictions, in order to impose as few difficulties as possible in the free use and disposal of the particular estate conveyed.   And it may be said that if the words are doubtful, they will be resolved in favor of keeping the restriction within the narrowest limits. In other words, if there be doubt as to the intention of the parties, Courts will naturally lean in favor of the freedom of the property.

And in addition to this we may add, that it is perfectly competent for the company in selling or leasing the property, to provide *in the lease or conveyance or by agreement*, for the erection of buildings according to a certain designated plan or design.

Now, as to the by-law, " to regulate other proceedings," this we agree is too vague and indefinite to be the subject-matter of enforcement by a Court of Equity.   What it means, whether to regulate the general disposition or management of the property, or to regulate its use before or after sale, it is not an easy matter to say.   And if it relates

to the use, in what respect the directors are to regulate it, no one can tell.  They could have no power, it is clear, to so regulate its use as to deprive the purchasers of the beneficial enjoyment of the property.

So the only objection that the defendant can fairly make to the title offered by the company is the restriction which requires the design of the building to be erected by him to be submitted for the approval of the directors.  This restriction, we have said, was intended for the common benefit and protection of all purchasers and as such may be enforced against anyone coming in under title from the company with notice of such restrictive covenants.  The appellant being unable, therefore, to convey the lot to the defendant free and discharged of this restrictive covenant, the bill for the specific performance of the contract of sale must be dismissed.

*Decree affirmed and bill dismissed.*

(Decided June 20th, 1895.)

The appeal of *Devries and Ramsay* v. *Cone* was argued by *William A. Fisher* (with whom were *Wm. Cabell Bruce* and *D. K. Este Fisher* on the brief), for the appellants, and *John F. Williams* (with whom was *Samuel C. Houlton* on the brief), for the appellee.   In this case the decree of the lower Court was, on June 20th, 1895, affirmed for the reasons assigned in the foregoing opinion in the case of the *Peabody Heights Co.* v. *Willson.*

Subsequently a motion for a re-argument was made, and in disposing of the same,

BOYD, J., delivered the opinion of the Court.

At the April term, 1895, of this Court, an opinion was filed in the case of the *Peabody Heights Co. of Baltimore City* v. *Willson*, which was intended to dispose of the questions raised by the appeal in this case.   A motion for re-argument having been made, permission was granted to the

parties to argue the questions presented by the motion on notes to be filed by the first day of the present (January) term. The object of the motion is to have a re-argument of the case, or, if that be refused, to obtain an expression of the opinion of this Court as to what effect the dissolution of the Peabody Heights Company would have on the provision referred to in the opinion, that the design of the buildings to be erected on the lots sold was to be approved by the directors of the company.

It was said in the opinion that the object of this provision and others referred to, was " to secure the erection of a better class of buildings, with attractive surroundings, and to prevent the erection of inferior buildings that might diminish the value of the property and affect its eligibility for building purposes. It was intended not only for the benefit of the lessor and the company, but for the common advantage and protection of all persons coming in or taking title under the company. And such being the case we cannot agree with the argument that if a building erected according to a design approved by the directors should be destroyed, the owner would have the right to rebuild without regard to the original design, and in any manner he might see proper. Such a construction would in a measure put it in the power of owners to render this restriction inoperative and of no effect, or, at least, would give them the right to erect an inferior class of buildings. They would have the right, no doubt, to rebuild according to the original design, and this, too, with or without the approval of the directors. And when we say according to the original design we do not mean that the purchaser is obliged to conform to it in every particular. As was suggested in the argument, it rarely happens that in the erection of a dwelling house changes from the plan or design do not become necessary. And all that would be required of a person, under this restriction, is that he shall not make such changes as would substantially affect the general plan approved by the directors."

We think that language is capable of an interpretation

that renders our construction of this provision narrower than was intended. If a building which has been erected according to plans approved by the directors is destroyed, or for some other reason the owner desires to rebuild it, we do not think it is necessary to again submit plans to the directors for their approval, or to follow in all its details the original plan. The latter may in course of time be impossible, as the plans may be destroyed and the architect who furnished them be dead and his papers inaccessible or lost. Nor do we think this by-law can properly be so interpreted. It provides that " no land to be sold or leased without a pledge to build speedily, design of buildings to be approved by the directors." The buildings referred to evidently mean those for which pledges to " build speedily " are to be given and not those that may be built in years to come in place of those thus intended to be speedily built. Any other construction might result in requiring some, if not all of these lots, to eventually remain unimproved, as the time may and doubtless will come when this 'company will go out of existence and there will be no directors. There may be circumstances, owing to the growth of the city, change of business locations or other causes that may make the houses constructed on these lots according to the designs approved by the directors altogether unsuitable for the new condition of affairs, and the contracting parties never could have contemplated when making this provision that it should be forever afterwards impossible to erect any other house on one of these lots unless it be the counterpart of the one first built. The term "design" was not used in its strictly technical sense, such as architects might understand it, but it only refers to the general plan, and not to the details of construction of the building. The object of the provision, as was said in the former opinion, was to secure the erection of a good class of buildings and prevent inferior ones from being built, and in case the original one be destroyed, or the owner desire to replace it, all that could fairly be required of him would be that the new one be equal or superior to the former

in appearance, size, materials used, &c. ; provided it be not contrary to some express requirement or prohibition of the directors in the approval of the original plan.

The owner of the lot must erect the original buildings according to the plans approved by the directors, and must conform to them in size, style, &c., as far as required by his agreement, but, unless he agrees to the contrary, this by-law will not require him to follow the original plans beyond what we have indicated. It would not be good faith on his part to utterly ignore the plans originally adopted and agreed upon, and erect a new building inferior to the original one, calculated to injure and thereby depreciate the value of the adjacent property. A Court of Equity would not permit it, and for that reason we are of the opinion that he should be required to conform to the original plan so far as would be necessary to avoid such results, but only to that extent.

Having already said that it is not necessary to again obtain the approval of the directors for a building to be erected in place of the old one, the question as to what would be the effect of the company's going out of existence, and therefore having no directors, does not seem to be very material to this case. But the company having agreed to require of purchasers of lots that the designs of the buildings to be erected on them should be approved by the directors, that should be done in all sales made by it, and in the event of a dissolution of the company and the appointment of a receiver, the Court should either require such approval by the directors last in office, or see that some provision be made to protect those who had purchased from the company, by directing the receiver to exact of purchasers that they will not erect buildings inferior to those previously authorized by the directors and already erected in the same neighborhood, or adopting some of the plans approved of by them, or in such other manner as the Court may think will best cause a compliance with the spirit of the agreement entered into between the company and its vendor, and will protect those holding title through the company.

Although what we have said will probably remove many of the objections urged, yet as Mr. Cone was not aware of these restrictions when he agreed to purchase, we cannot compel him to accept the property, and notwithstanding the modifications of the former opinion by what we have said, the results reached in this and in the Willson case cannot be changed.   The decrees must therefore stand affirmed in both cases.

*Decrees affirmed.*

(Decided March 26th, 1896.)


BRYAN, J., dissented and delivered the following opinion :

In the year eighteen hundred and seventy, William Holmes owned a tract of land lying in that portion of Baltimore County, which has since been annexed to the city.   It was estimated to contain thirty-six acres, more or less.   On the fourteenth day of October, in the year just mentioned, he signed, sealed and acknowledged a lease of all this land (with the exception of a small portion hereafter to be noticed) to the Peabody Heights Company of Baltimore City, for the term of ninety-nine years, renewable forever.   The lease was not delivered to the lessee, but was placed in the possession of an agent of Holmes to be held as an *escrow*. Before the delivery of the lease an agreement was made between the lessor and lessee under their respective seals, whereby they covenanted with each other that a certain contract of sale, dated September the twentieth, eighteen hundred and seventy, should be binding on them and their assigns, " so that the covenants, requirements, restrictions, regulations and reservations contained therein should be fully complied with and carried out, as if they had been embodied in the lease of the property."   The contract of September stipulated that after the payment of twenty-five thousand dollars by certain persons, who, with others, afterwards formed the corporation styled the Peabody Heights Company of Baltimore City, one hundred and fifty

thousand dollars should be placed at ground rent on the property at the rate of six per cent. per annum. And it contained a stipulation that Holmes would receive, in reduction of the ground rent reserved in the lease, such ground rents as might be created by leases of portions of the land, after such portions should have been improved by the erection of buildings thereon. And the lessor reserved one-fourth interest in the property; the understanding being that when a joint stock company should be formed, he should receive one-fourth of the number of the shares issued. The land not embraced in the lease was a square fronting four hundred feet on the west side of St. Paul street, as extended into Baltimore County. Holmes reserved this square to his own use, and he agreed to build upon it a good house, setting it twenty feet back of the building line of St. Paul street extended. And it was also agreed that reference should be made to a memorandum appended to the agreement which was signed by George W. Tinges agent, dated September 13th, eighteen hundred and seventy, for the better understanding and explanation of the agreement, and for further details in reference thereto; said memorandum having been approved in the September contract by him and the parties of the second part as the basis of the agreement. In this memorandum a plan of the joint stock company (to be formed) was exhibited, and certain by-laws were set forth. The by-laws are thus stated:

1. No land to be sold or leased without a pledge to build speedily; design of buildings to be approved by the directors.

2. Buildings to be 20 feet back of building line, and front to be ornamented with shrubbery and flowers.

3. No nuisance, factories, lager beer saloons, &c., to be permitted. Clause in deed to this effect.

4. To regulate other proceedings.

If the stipulations in these contracts and in the memorandum had been contained in the lease, they would have been covenants running with the land. This has been settled ever since *Spencer's case*, 5 Coke. In the language of

that case, they "touch and concern the thing demised;" and the things to be done are " to be made on the thing demised." But as they were not inserted in the lease, they do not run *at law.* Nevertheless, as they are matters capable of running with the land at law, and as they were made the basis of the negotiations on which the lease was founded, and the lessee covenanted that they should be binding on it and its assigns as if embodied in the lease, they are an equitable charge and burden on the leasehold. According to the rule in such cases, it is enforceable against the covenantor and those claiming under him with notice ; and to this extent it runs with the land in equity. That is to say, the burden of performing these covenants is imposed on the lessee's assignees with notice, and the benefit of them, by virtue of Statute Henry VIII chapter 24 is conferred on the assignors of the lessor. I am not aware that any other or greater effect has ever been claimed for a transaction of this kind in any book, decision, dictum or any other declaration of opinion known to the law. We are informed by the record that Holmes's reversion is now vested in the Peabody Heights Company. Both lease and reversion are held by the same person. The burden of the covenants and the benefit of them are united in the same estate. The lease has been merged in the reversion. They are both held by the Peabody Heights Company, and by their consolidation have become a fee-simple. If the covenants were in existence the burden of them would be performed and the benefit received by the same person. It appears to me to be an inevitable consequence that the covenants in favor of Holmes, the original reversioner, are entirely annulled.

But there is another question to be considered. Holmes retained a portion of his land when he and the Peabody Heights Company entered into the covenants with each other. His covenant was for the benefit of the leasehold conveyed to the Peabody Heights Company, and the covenant of the company was for the benefit of the land which he retained. These mutual covenants conferred on each party respec-

tively rights in the soil of the other.   Holmes acquired an easement in the property of the Peabody Heights Company for the benefit of the land which he retained, and to that extent his land became the dominant tenement; on the other hand that company acquired an easement in Holmes's remaining land for the benefit of the leasehold, and to that extent it also became the dominant tenement.   Each tenement was both dominant and servient in certain particulars. Although the instruments executed by the parties are in the form of covenants, they show an intention to create a charge or burden on the lands respectively held by them, and are in effect grants of easements.   Speaking of instruments of this kind, LORD WENSLEYDALE, in *Rowbotham* v. *Wilson*, 8 House of Lords Cases, 362, said: " No particular words are necessary for such a grant; any words which clearly show the intention to give an easement, which is by law grantable, are sufficient to effect that purpose.   If the words used could only be read as amounting to a covenant, it must be admitted that such a covenant would not affect the lands in the hands of assignees of covenantors, but if they amount to a grant, the grant would be unquestionably good and bind the subsequent owners."   The legal title to these easements has not been perfected by deed acknowledged and recorded as required by the registry laws, *Baltimore, &c., Railroad* v. *Algire*, 63 Md. 323; but they will be protected in equity against the covenantors (or grantors) and their assigns with notice.   It may be stated that an easement does not require the owner of the servient tenement to do anything or perform any service for the benefit of the dominant tenement.   In *Washburne on Easements* (m. p. 4 and 5) it is said: " It is the nature of servitude not to constrain anyone to do, but to suffer something; *ut aliquid patiatur ant non faciat.*" And in *Gale on Easements*, 7, we find the law stated as follows: " The right conferred by an easement attaches upon the soil of the servient tenement; the utmost extent of the obligation imposed upon the owner being not to alter the state of it, so as to interfere with the enjoyment of the

easement by the dominant." In *Tulk* v. *Moxhay*, 1 Hall and Twell, 105 (reported also in 2 Phillips, 774), Tulk had conveyed to Elms by indenture a parcel of ground called Leicester Square Garden or Pleasure Ground, which was surrounded by an iron railing, and planted with trees and shrubs, and ornamented by an equestrian statue; and Elms had covenanted in the indenture that he would keep and maintain the garden with the iron railing around the same in its then present form, in neat and ornamental condition uncovered with buildings, and would not permit the equestrian statue to be defaced or taken down, and that the inhabitants of Leicester Square, tenants of Tulk, and that Tulk himself should have the privilege of admission to the garden at all times on the payment of a reasonable rent. By a number of *mesne* assignments Moxlay had become entitled to the property with notice of the covenant. In disregard of it, he was proceeding to pull down the iron railing, and to cut down the trees and shrubs, and he had formed a plan for the erection of lines of shops and buildings on the ground. LORD CHANCELLOR COTTENHAM decided that Tulk was entitled to a perpetual injunction to restrain Moxlay from converting or using the garden and the iron railing around it to or for any other purpose than a pleasure ground uncovered with buildings. He said that the parcel of land was purchased subject to an equity created by a party competent to create it; and that the defendant took it with distinct knowledge of such equity existing, and that it ought to be enforced against him, as it would have been enforced against the original purchaser from Tulk. (1 Hall & Twell, 116.) It will be seen that the decree of the LORD CHANCELLOR did not require the defendant to do anything affirmatively; but merely prevented him from doing what he had no right to do. It was because the decree was merely prohibitory, that it was approved by the Court of Appeal in *Haywood* v. *Brunswick Building Society*, L. R. 8 Queen's Bench Division 406. This last case was said by JESSEL, Master of the Rolls in

*London, &c.,* v. *Gomm,* L. R. 20 Chancery Division 583, to decide that the Court would not extend the doctrine of *Tulk* v. *Moxlay* to covenants compelling a man to lay out money or do any other thing of an active character ; but that it was to be confined to restrictive covenants.   And substantially the same thing was said by the Court of Appeal in *Auster-berry* v. *Corporation of Oldham,* L. R. 29 Chancery Division 750.   I have thought it proper to make these remarks for the purpose of showing the nature of the decree, which it is competent for a Court of Equity to make in cases of this kind.   But they are not necessary to a decision of this particular controversy, because the covenants obnoxious to the litigating parties have been released by the assignee of Holmes.  The record shows that the land which he reserved has been conveyed to the Kelso Home for Orphans, and that by recorded conveyance it has released to the Peabody Heights Company all its right to enforce the first and second by-laws, except the requirement that buildings shall be set back twenty feet from the building line.   If this release is held to be operative to discharge the Peabody Heights Company from the obligation of these by-laws (with the exception named), the parties to this cause agree that the cause of contention is removed.   It is extremely difficult to see a reason why the release should not have this effect.  The assignee of Holmes had an easement binding on the property of the Peabody Company, and his property was subject to a corresponding servitude for the benefit of this company.   It was a simple case of an owner disposing of property which belonged exclusively to himself.   It must be remembered that these "*restrictive covenants*" acquire all their efficacy in favor of assignees because they are grants.   If they were merely covenants, and nothing more, they would not bind the assignee of the covenantor.   This is perfectly clear upon principle, and also on the highest authorities known to the law.   The question is elaborately discussed in the notes to *Spencer's case,* 1 Smith's Leading Cases ; and the conclusion is stated that there is no authority that

the burden of a covenant will run with land in any case ex-
cept that of landlord and tenant.    And this view of the law
is approved as " the better opinion " by the most eminent
English Judges.    *Austerberry* v. *Corporation of Oldham*, 29
Chancery Division, 750, and other cases.    Inasmuch as it
has not been contended in this case that these covenants
were capable of running with the land, I do not think that
the occasion requires a full discussion of the question.    I
may be allowed, however, to say that in all the cases which
have been argued in this Court on questions of this kind,
these covenants have been regarded as impositions of ser-
vitudes or easements on the land sold, and enuring for the
benefit of the land retained by the grantor.    In no case has
it ever been intimated that this right (easement, servitude,
equity or by whatever name it may be designated) could be
enforced in favor of anyone, except the grantor for whose
benefit it was created, or his assignees.    That is, to apply
the doctrine to the present case, in favor of the assignee of
the square reserved by Holmes.

I have stated what I think is the proper construction of
these " restrictive covenants."    But independently of the
effect which the law attributes to them, I can discover no
intention on the part of Holmes to exact covenants for any
other purpose than the benefit of his own property.    All of
the instruments executed by him and his grantees were in
the form of indentures under their respective hands and seals;
Holmes contracting as the party of the first part, and the
grantees as parties of the second part.    Each party con-
tracted for his own interest and for that of no other person.
The covenants were expressed to be made with each other;
and the parties of the first and second parts bound " them-
selves, their heirs, executors, administrators, representatives
and assigns," and no one else.    As no one else was or could
be bound, so no one else was mentioned as entitled to en-
force any obligation which was created.    The form and lan-
guage of the instrument confined its benefits and obligations
to the parties who executed it.    It can hardly be supposed

when Holmes was contracting for the purpose of benefiting his own land, that he intended to put it out of his power to release the other party from the contract, if his own interest or convenience should be promoted by such release.    At all events the contract expresses no such intention ; and it contains no language from which such intention can by any means be inferred.    The circumstance that he stipulated that he would become the owner of one-fourth of the stock of the corporation to be formed, could have no effect on the meaning of the " restrictive covenants."    In *Newbold* v. *Peabody Heights Company*, 70 Md. 493, the scope and effect of these restrictions were fully and clearly stated.    It was said :  " The interest in Holmes for imposing the restrictions and conditions specified in the memorandum is very apparent.    He reserved to himself and for his own use, as the site for a residence, a block or square of the parcel of land owned by him, all of which, except the square reserved, was embraced in the lease.    He manifestly intended his own property to be benefited by the restrictions imposed upon that leased to the company ; and, as we have seen, those restrictions are of a character that will be enforced by a Court of Equity."    In that case it was argued that Holmes had waived them in his lifetime.    The Court was not satisfied that there had been a waiver ; but forbore to determine the question because there was no one before the Court to represent the estate of Holmes.    It was not suggested that they could not have been waived by Holmes or his assignee. The case was decided distinctly on the authority of *Tulk* v. *Moxhay* which I have above cited.

If I have correctly stated the effect of these restrictive covenants, it does not seem important to consider the meaning of other intruments couched in different terms and executed under different circumstances.    Many cases which are frequently cited in discussions of this kind arose on what have been called " building schemes."    The owner of a parcel of land divides it into lots and causes a map of it to be made, showing squares, avenues, streets and lanes, with

plans for buildings, their locations and other details con-
nected with them, and exhibits this map to purchasers, and
sells lots to them with reference to it.   Without anything
more, a covenant on the part of the vendor is implied that
the purchasers shall be entitled to all the advantages to
their property which are shown on the map.   With respect
to streets so delineated, the principle was settled in *White* v.
*Flannigan*, 1 Maryland, 540, and *Moale* v. *Mayor, &c.*, 5
Maryland, 314.   And there can be no difference in the case
of other valuable rights which would be enjoyed if the land
were used in the manner designated on the map.   Some-
times there are express covenants mutually made between
the seller and each of the purchasers, as was done in *What-
man* v. *Gibson*, 9 Simon, 196.   Sometimes the contract is
implied from circumstances, as was done in *Nottingham
Patent, &c., Company* v. *Butler*, L. R. 15 Queen's Bench
Division, 261.   In this last case a body of land containing
about forty-two acres was offered for sale by auction in
thirteen lots, with certain conditions of sale ; one of the con-
ditions was that no part of the land should be used as a
brickyard, or for the making of bricks, except lot num-
ber 13.   All of the lots except No. 13 were sold either by
auction or at private sale, subject to the restrictions.   The
questions were whether they were for the common benefit
of the purchasers, and whether they could enforce them
against each other ; excepting, of course, the purchaser of
number 13.   The learned Judge who decided the case, in
delivering his opinion, said: " It appears to me that where
land is put up to auction in lots, and two or more persons
purchase according to conditions of sale containing restric-
tions of the character of those under consideration in the
present case, it is very difficult to resist the inference that
they were intended for the common benefit of such pur-
chasers ; especially where the vendor purposes (as in the
present case) to sell the whole of his property.   Where he
retains none, how can the covenants be for his benefit ; and
for what purpose can they be proposed except that each

purchaser, expecting the benefit of them as against his neighbors, may be willing on that account to pay a higher price for his land than if he bought at the risk of whatever use his neighbor might choose to put his property to? Where, therefore, the vendor desires to sell at the auction the whole of his property, the inference is strong that such covenants are for the common benefit of the purchasers." It is very evident that in all cases of this nature the rights of the parties interested must depend on the effect of the contract made with the vendor of the land.    When the construction of that is determined, all other questions are easily settled.    When the owner of land sells a portion of it, and it is agreed between seller and purchaser that neither the land sold nor the land retained shall be used in a certain specified manner, or that it shall be used only in a particular way; if either vendor or purchaser shall violate the contract, the injured party must be entitled to redress. The vendor has imposed a servitude on his portion of the land for the benefit of the purchaser; and the purchaser has imposed a servitude on his portion of the land for the benefit of the vendor.    The assignees of each party take the land with the servitude binding it.    When the owner divides his land into lots and offers them for sale, and makes it a condition of the sale that none of the lots shall be used in a particular way, as soon as one of the lots is sold a contract with the purchaser springs into existence.    He acquires a right over all the land offered for sale, which enables him to prevent it from being used in the forbidden way; and also, the vendor has a right of the same kind over the lot which he has purchased. That is to say, reciprocal servitudes have been created.    When another lot is sold, the purchaser, with knowledge of the terms on which the first was sold, takes his lot bound by the servitude.    And so on, as the lots are successively sold. In this way it occurs that each purchaser can maintain the servitude over the whole body of land, whether it be in the ownership of the original vendor, or whether it be in the

hands of a purchaser from him with notice.   No principle
which can be evolved from any case of authority will mili-
tate against what has been said in respect to the servitude
in question in this case.   It is very clear that the Peabody
Heights Company made the contract concerning the by-laws
with Holmes alone, and that it is bound only to Holmes
and his assignees.   And it is equally clear that Holmes
made his contract concerning the building on the square
retained by him with the Peabody Heights Company and
with no one else, and that he became bound only to the
company and its assignees.   And it is also clear that the con-
tract binding Holmes is a distinct thing from the contract
binding the company.

I agree with the majority of the Court that the by-law
" to regulate other proceedings " is totally ineffective.   But
as the release from the Kelso Home removes the only objec-
tions which the purchaser makes to the title, I think that
this is a proper case for specific performance.

(Filed October 3rd, 1895.)