JAMES CLAWSON JONES ET AL *v.* NORTHWEST REAL ESTATE COMPANY.

*Building Restrictions—Requirement of Approval of Plans— Estoppel to Assert.*

That a salesman for a company, developing a tract of land for residences, stated to a prospective purchaser that the latter could build a second-story porch, and pointed out several such porches already built, did not estop the company to assert a covenant, known to the purchaser, requiring its assent to all erections within the tract, and to withhold its consent to a second-story porch different from those already built.          p. 276

Covenants containing building restrictions will be upheld where the intention of the parties is clear, and the restrictions within reasonable bounds.                                        p. 278

A covenant, in deeds of lots in a tract of land being developed for residential purposes, requiring all plans for proposed buildings to be approved by the grantor company, and giving the latter the right to withhold such approval if the use, shape, height, materials, location, and approximate cost of the structure, and the grading plan of the lot, do not reasonably conform to the general plan of development, or if the plans are out of harmony in any of such particulars with other structures in the tract, or would unreasonably interfere with the outlook from other structures, is valid.                          pp. 277-279

Under such a covenant, the grantor was entitled to refuse his approval of plans, for the reason that the second-story porch shown thereon would give the house the appearance of a two-

family dwelling, and thus render it out of keeping with the surrounding structures and with the general appearance of buildings in the tract.                                    p. 279

The possible invalidity of a provision in such a covenant, entitling the grantor to withhold its approval of plans for "aesthetic reasons," does not affect the validity of the other provisions of the covenant.                                    p. 279

Evidence as to the difference between the second-story porch shown on the purchaser's plans, and a second-story porch such as the grantor was willing to authorize, *held* sufficient to relieve the latter from the charge of arbitrariness or unreasonableness in disapproving the plans.                          pp. 279, 280

The question of the existence of a general plan of improvement is not material in a suit by the original grantor, still owning a considerable part of the tract, against the assignees of the original purchaser of a lot, to enforce a restrictive covenant expressly binding "the grantees, their heirs and assigns." p. 280

*Decided December 10th, 1925.*

Appeal from the Circuit Court No. 2 of Baltimore City (STANTON, J.).

Bill by the Northwest Real Estate Company against James Clawson Jones and Anita S. Jones, his wife. From a decree for plaintiff, defendants appeal. Affirmed.

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*Rowland K. Adams,* with whom was *Isidor Goldstrom* on the brief, for the appellants.

*Walter C. Mylander,* with whom were *Charles M. Armstrong* and *William C. Cook* on the brief, for the appellee.

WALSH, J., delivered the opinion of the Court.

The Northwest Real Estate Company, the complainant below, filed a bill in equity against James Clawson Jones

and Anita S. Jones, his wife, the defendants below, alleging that the erection of a hip roof second-story porch on the home of the defendants was a violation of certain restrictions binding on the land on which the house was built, and from a decree of the lower court sustaining this contention and directing that the porch be removed, the defendants have appealed.

The testimony shows that in 1920 the appellee purchased a tract of about 170 acres of land in Baltimore City at a cost of between $460,000 and $470,000, that this tract was subsequently laid off in lots, that streets, roads and other improvements costing approximately $500,000 were made in it, and the whole development placed on the market under the name of "Ashburton." It also appeared that the completion of the improvements throughout the whole tract would cost an additional $100,000, that 400 of the 600 lots in the development had been sold, that about 225 houses had been built on the lots thus sold, and that the deeds for all lots sold contained a number of uniform restrictive covenants. The avowed purpose of these covenants was to provide a general plan or scheme of development for the whole tract, and to insure its being and continuing to be a high-class residential district.

In June, 1923, the appellee conveyed to Elias H. Read and wife a lot of ground in Ashburton lying at the northeast corner of Egerton Place and Dennison Road, and on May 23rd, 1924, the appellants required title to this lot from the widow of Read. Both of the deeds by which these two conveyances were made contained the restrictive covenants found in all deeds for lots in Ashburton, and it is conceded that the appellants knew of the restrictions and considered themselves bound by them. Prior to purchasing the lot the appellants had secured plans for the erection of a two-family dwelling, and these plans called for what is known as a hip-roof second-story porch. Mr. Jones, one of the appellants, testified that, when looking at the lot with a view to purchasing it, he asked the salesman, Mr. Donovan,

a representative of the George R. Morris Organization, of which Mr. George R. Morris, president of the appellee, was also president, whether or not second-story porches were permitted, and was told by him that they were, and his attention was called to several houses in the vicinity which had second-story porches, but it does not appear that the appellant Jones at that time exhibited his plans to Donovan, or advised him of the character or kind of second-story porch he proposed to erect. Several days after he acquired title to the lot, the appellant Jones, in compliance with the ninth covenant in his deed, submitted his plans to George R. Morris for approval, and while waiting in the office of the appellee, which was also the office of the George R. Morris Organization, Donovan, whom he found there, looked over his plans and told him "they looked mighty fine" and he did not think he would have any trouble with them. However, when the plans were shown to Mr. Morris he made several objections to them, and particularly objected to any second-story porch. Mr. Jones agreed to modify the plans to meet all of Mr. Morris' objections except as to the second-story porch, and on this point he told him of Donovan's statements to him prior to the time he bought the lot, and also stated that some of the houses already built in Ashburton had second-story porches. Mr. Donovan was then called in and confirmed the statements of Mr. Jones, and after the plans of the six or seven houses in the addition which have second-story porches had been examined, Mr. Morris stated that he would approve a second-story porch similar in design to any of those already existing, but he would not approve the sort of second-story porch shown on the appellants' plans. Mr. Jones then left and several days later he and Mr. Tase, a builder, called on Mr. Morris and again tried to secure his approval of the plans. Mr. Morris still refused to approve them, and after Mr. Tase had said, "If I were building the house, I would build it the way shown on the plans; of course, my advice to Mr. Jones would be the same thing," both Mr. Tase and Mr. Jones left. The plans were retained.

by Mr. Morris, and, when a young man from Mr. Jones' office called for them a few days later, they were given him with the porch scratched off and the plans marked, "Approved, subject to changes noted." This young man signed Mr. Jones' name to the plans, *per* his own, purporting to accept them as modified, and subsequently Mr. Jones began the erection of the house, but did not employ Mr. Tase to build it. On October 3rd, 1924, an inspector for the appellee noticed that the appellants were erecting the porch called for in the original plans, and being unable to get in personal touch with Mr. Jones, a letter was sent to him by the George R. Morris Organization calling his attention to the second-story porch being erected, and advising him that, unless the porch was changed to conform to the approved plans, steps would be taken to stop the work. This letter was not answered, and on October 10th, 1924, the bill of complaint in this case was filed, and the ensuing suit resulted as above set forth.

It was charged in the bill that the work on this porch was rushed for the purpose of getting it built before the appellee could interfere, but this allegation cannot be sustained, because, according to the testimony, it was practically completed before the defendants received the letter above mentioned. Nor do we find any support for the allegation in the defendant's answer that the appellee did not act in good faith in refusing to approve the plans originally presented. This disposes of the charges of improper conduct by the respective parties, and brings us to a consideration of the real question in the case, which is the validity and meaning of the ninth covenant in the defendants' deed, and the legality and effect of the conduct of the parties thereunder. This covenant reads as follows:

"9. No building, fence, wall or other structure shall be commenced, erected or maintained on, or shall any addition to, or change or alteration therein, be made, until the plans and specifications, showing the nature, kind, shape, height, materials, location and approximate cost of such structure and the grading plan of

the plot to be built upon, shall have been submitted to and approved in writing by the party of the first part. The party of the first part shall have the right to refuse to approve any such plans or specifications or grading plan, which are not suitable or desirable, in its opinion, for aesthetic or other reasons; and in so passing upon such plans, specifications and grading plans it shall have the right to take into consideration the use and suitability of the proposed building or structure and of the materials which it is to be built, to the site upon which it is proposed to erect the same, the harmony thereof, with the surroundings, and the effect of the building or other structure as planned on the outlook from the adjacent neighboring property."

The appellants contend that this covenant did not authorize the appellee to enforce the attempted alteration of their building plans; that even if it did, the appellee was estopped from enforcing it as to the second floor porch because of the statement of Donovan made prior to the purchase of this lot by the appellants; and, finally, that the difference between the porch wanted by the appellants and that which Morris indicated he would approve was so slight as to render the action of the appellee in changing appellants' plans unreasonable and arbitrary, and hence unenforceable.

We do not think the appellants made out a case of estoppel. Aside from the question of how far the statements of Donovan, an employee of the George R. Morris Organization, could bind the appellee, the Northwest Real Estate Company, the record shows that Donovan did not tell Jones he could build any kind of second-story porch he wanted. He merely said he could build a second-story porch, and pointed out several houses in Ashburton which had second-story porches, and Morris confirmed this by agreeing to let them erect a second-story porch of the kind already built there. Jones knew that under the covenants in his deed he would have to submit his plans to the appellee for approval, there is no evidence that he submitted these plans to Donovan, or to anyone else, prior to the purchase of the lot, and under these

circumstances we are of the opinion that Donovan's statement that second-story porches could be built, and his indication of some that had been built, was not sufficient to estop the appellee from refusing to approve the erection of a porch different from those already built in Ashburton.

This brings us to a consideration of the appellants' contentions regarding the covenant itself and the appellee's interpretation and application of it in this case, and these matters we will consider together.

The appellants do not seriously challenge the validity of the ninth covenant as a whole, nor do we think they could successfully challenge it. The language of the covenant is quite broad and comprehensive in its terms, and gives the appellee rather drastic control over the character of buildings to be erected, but we perceive nothing so contrary to public policy in its provisions as to warrant our striking it down. There is a constantly increasing demand on the part of the public for homes in restricted residential districts, and the restrictions desired are growing both in number and scope. Many people seem to want to live in neighborhoods in which all the houses are to be a certain distance back from the street, are to cost not less than a certain sum of money, are to be occupied by not more than a certain number of families, are to conform in size and appearance with the surrounding houses, are not to have structures other than a residence on the lot, and so on. Whether this tendency is wise or unwise, it is not our province to determine; we are confined entirely to a consideration of the legality of the restrictions themselves and of the covenants or other means by which they are imposed. In this case we are dealing with a covenant, and we do not think that the restrictions to which the parties have voluntarily agreed interfere with the fee of the land to such an extent as to render them void. In *Meredith v. Danzer,* 142 Md. 573, restrictions covering the cost of buildings to be erected and their distance from the street line were considered valid. In *Ringgold v. Denhardt,* 136 Md. 136, the Court entertained no question as to the validity of a

covenant prohibiting the erection of any buildings save residences on the lots involved in that case. In *Peabody Heights Co. v. Willson,* 82 Md. 186, 203, this Court expressly approved a provision requiring the "design" of proposed buildings to be approved by the directors of the grantor; and in *Harmon v. Burrow,* 263 Pa. St. 188, the Supreme Court of Pennsylvania sustained a covenant requiring that the plans for all structures to be erected on the premises in question be submitted to and approved by the grantor or his legal representative. And see also *Bealmear v. Tippett,* 145 Md. 568; *Saratoga Building Co. v. Stables Co.,* 146 Md. 152, 158; *Wood v. Stehrer,* 119 Md. 143; *Foreman v. Sadler's Executors,* 114 Md. 574; 18 *A. L. R.* 451, note; and 18 *Corpus Juris,* 385.

The general rule deducible from the authorities seems to be, that where the intention of the parties is clear, and the restrictions within reasonable bounds, they will be upheld. See cases cited *supra.* In our opinion the covenant involved in this case meets these tests. There can be no question as to the intention of the parties, the present suit shows the attitude of the appellee, and as the appellants voluntarily submitted their plans for approval and actually adopted some of the changes suggested by Morris, it can hardly be contended that they did not understand that it was the intention and purpose of the covenant that the appellee's approval of all plans should be obtained. Nor do we find the provision requiring the submission of these plans unreasonable. See *Peabody Heights Co. v. Willson, supra; Harmon v. Burrow, supra.*

The next question is whether or not the provisions set up in the covenant to guide the appellee in approving or disapproving the plans submitted are reasonable. We have no doubt as to the validity of the provisions authorizing the appellee to withhold its approval if the use, shape, height, materials, location and approximate cost of the structure and the grading plan of the lot did not reasonably conform to the general plan of development, and to refuse to approve

the plans for buildings which would be out of harmony in any of the particulars mentioned with other structures in the addition, or which would interfere unreasonably with the outlook from other structures in the vicinity. See cases heretofore cited. Whether the provision that "the party of the first part shall have the right to refuse to approve any such plans or specifications or grading plan, which are not suitable or desirable, in its opinion, for aesthetic or other reasons," is valid in its entirety is more difficult to determine. We have already seen that the appellee could validly pass upon the suitability and harmony of any proposed structure, considered in connection with the other buildings and the general surroundings in the development, but we think that any reason, assigned by the appellee for refusing to approve plans submitted to it, would have to bear some relation to the other buildings or general plan of development. Whether the appellee could decline to approve plans for "aesthetic reasons" may be open to question because of the difficulty of establishing any standard by which aesthetic values could be determined, but we do not consider it necessary to decide whether the provision in the covenant in the present case relating to aesthetic reasons is valid or not. Morris declined to approve the appellants' plans because he claimed the second-story porch shown on those plans would give the house the appearance of a two-family dwelling, and thus render it out of keeping with the surrounding structures and with the general appearance of buildings in Ashburton, and we think this reason a sustainable one under the covenant, without regard to any purely aesthetic consideration. And of course the valid provisions of the covenant can be sustained even though the part referring to "aesthetic" reasons be invalid. *Peabody Heights Co. v. Willson, supra.*

The appellants, however, insist that even though the reason assigned by Morris is good under the covenant, there is not sufficient difference between the porch shown on their plans, and the porches which Morris was willing to authorize,

to justify Morris in rejecting the former. The testimony given on this point by Morris, himself a graduate architect, is largely supported by the evidence of Mr. Palmer, consulting architect for the Roland Park Company, and by the witnesses Ellis and Johnson, both of whom were expert real estate and building men. It is true that on cross-examination both Palmer and Ellis expressed doubt as to the ability of a layman to identify a house as a two-family dwelling simply because of the character of the second-story porch on it, and the appellant Jones and two of his witnesses, one a builder and the other an architect, testified that the appellants' house was in full harmony and keeping with the surrounding properties, but we are of the opinion that the testimony in support of Morris' contention was sufficient, under the circumstances of this case, to relieve him of the charge of arbitrariness or unreasonableness in making his decision. It must be remembered that the appellants agreed to submit the size, shape, materials, etc., of their house to the approval of the appellee, and in pursuance of that agreement they actually did submit these matters. The appellee, acting through its president, Mr. Morris, declined to approve the shape of the second-story porch wanted by the appellants on the ground that it was not in harmony with the neighboring houses, and in our opinion, the evidence in the record does not justify the conclusion that this action of Mr. Morris was unreasonable.

There is some discussion in the brief of the appellants as to whether the provision in the tenth covenant, giving the appellee the right to waive many, if not all, of the restrictions in any particular case, does not destroy the theory of a general plan of development, and render the covenants unenforceable on the ground of lack of mutuality. We would have to consider this in a suit brought by one lot owner against another, but we do not consider it necessary to pass upon it in this suit, because we are here dealing with an original grantor, who still owns a considerable part of the land, and the assignees of an original purchaser, and, as the

deed specifically states that the covenants are to bind "the grantees, their heirs and assigns," there would seem to be no question, under the authorities, of the grantor's right to enforce the covenants, if they are otherwise valid. *Thurston v. Minke,* 32 Md. 487; *Halle v. Newbold,* 69 Md. 270; *Summers v. Beeler,* 90 Md. 474, and cases cited *supra.*

Finding no error in the case the decree appealed from will be affirmed.

*Decree affirmed, with costs to the appellee.*