NORMANDY SQUARE ASSOCIATION, INC., ET AL.,
APPELLEES, V. ELMA M. ELLS, APPELLANT.
327 N.W.2d 101

Filed December 10, 1982. No. 81-666.

Terry K. Barber of Johnston, Barber & Wherry, for appellant.

Barlow, Johnson, DeMars & Flodman, for appellees.

KRIVOSHA, C.J., HASTINGS, and CAPORALE, JJ., and RIST, D.J., and COLWELL, D.J., Retired.

COLWELL, D.J., Retired.

Defendant, Elma M. Ells, appeals from a mandatory injunction requiring relocation of a fence she built contrary to restrictive covenants and the approval of plaintiff Normandy Square Association, Inc. (Association).

The Association includes all owners of housing units in the Normandy Square addition to Lincoln, Nebraska. Pursuant to restrictive covenants, defendant made application to build a new fence on her property, Lot 11, Block 4. Upon review by the Association's architectural committee (committee), changes were required and conditional consent was given. Defendant disregarded the restrictions and constructed the fence as she had proposed. This suit followed. Upon trial, plaintiff Hassan Sharifi was the only witness; defendant offered no evidence.

After a personal inspection, the trial judge found for the plaintiffs, ordering the specific location of the fence, including a 25-foot setback from the street and enclosure of the utility box. Defendant appeals, assigning as error, considered together, (1) the covenants were vague and ambiguous, and (2) they were arbitrarily applied.

The only issue here is whether article VII of the corporate "Declaration of Covenants, Conditions and Restrictions" is enforceable. It reads in part as follows:

"Architectural Control

"No building, fence, wall or other structure shall be commenced, erected or maintained upon the property, nor shall any exterior additions to or change or alteration therein be made until the plans and specifications showing the nature, kind, shape, height, materials and location of the same shall be submitted to and approved in writing as to the harmony of external design and location in relation to the surrounding structures and topography by the directors of the Association, or by an architectural committee composed of three or more representatives appointed by the board."

Defendant's application was to build a 6-foot stockade-type fence beginning about 5 feet from her south front lot line, running thence west 7 feet, thence north along the west side of her residence 111 feet, thence east 35 feet, thence south 6 feet, and east 5 feet (to exclude a metal utility box), and thence south 23 feet to the midpart of the dwelling.

Within a few days the committee considered the application, and on December 8, 1980, approved the application with changes, material here, that the fence must commence 25 feet north from the south lot line; on the north, it must run straight east on the lot line, so that the utility box was south of the fencing; and "Should you desire during the winter to put up a temporary removable snow fence on the front twenty-five feet on the west, we see no objection to

that." The approval was personally delivered to defendant by Sharifi, the Association's secretary. It appears defendant understood the approval, but said "she wanted the fence and it was her property"; also, she had indicated that one purpose for the fence at the front was for protection from drifting snow.

Defendant contends *Ross v. Newman,* 206 Neb. 42, 291 N.W.2d 228 (1980), is dispositive here. We do not agree. *Ross* turns on the lack of a standard for "alteration." Here, the structure in question is a fence, which requires no further description or standard. Defendant understood the restriction, as shown by her application.

The record does present the question of whether or not the powers of the committee are ambiguous and enforceable. These issues are fully discussed in the annotation "Validity and Construction of Restrictive Covenant Requiring Consent to Construction on Lot," 40 A.L.R.3d 864 (1971). "It has been said that today housing is ordinarily developed by subdividers who utilize the restrictive covenant to guarantee to the homeowner that his house will be protected against adjacent construction which will impair its value, and that a general plan of development will be followed; the requirement of consent to construction or approval of plans of construction is one method by which guaranties of value and of adherence to a general plan can be accomplished and maintained.

"The cases collected herein . . . all seem to agree, at least as a generalized proposition, on the validity and, in a proper case, the enforceability, of covenants requiring consent to construction or approval of plans of construction, which covenants do not of themselves impose standards of approval . . . when applicable to all of the lots in a residential subdivision as part of a uniform plan of development . . . . *Also generally recognized is the validity and, in a proper case, the enforceability, of restrictive cove-*

*nants requiring approval of plans of construction, which covenants in themselves regulate the extent of the authority to approve, as by imposing standards upon which disapproval might be based."* (Emphasis supplied.) *Id.* at 870.

Article VII of the declaration imposes the following broad standard for the committee's approval: "[T]he harmony of external design and location in relation to the surrounding structures and topography . . . ." Such standard in a proper case is generally held not ambiguous, and enforcement follows where the authority is exercised reasonably. See, *Hollingsworth, et al., vs. Szczesiak, et al.,* 32 Del. Ch. 274, 84 A.2d 816 (1951); *Winslette v. Keeler,* 220 Ga. 100, 137 S.E.2d 288 (1964); Annot., 40 A.L.R.3d, *supra* at 876.

Other covenants included in the declaration and bylaws impose duties on the committee and owners to maintain the exterior attractive appearance and condition of the homes, common areas, streets, sidewalks, driveways, and parking areas, including control of the construction of foundations, the color of roofs and vents, and television antennas. A part of the declaration recites that such are for the "purpose of enhancing and protecting the value, desirability and attractiveness of said property . . . ."

It appears that article VII was a part of a general intended plan for the development, maintenance, and improvement of the subdivision for the benefit of all owners. *Hogue v. Dreeszen,* 161 Neb. 268, 73 N.W.2d 159 (1955).

As shown in the A.L.R. annotation, the authorities are in disagreement as to any rule of law that can be applied in these cases because of the unlimited purposes, plans, local regulations, and circumstances that may possibly exist. We think the applicable rule here is that where powers are granted to a committee to approve or disapprove the erection of a fence based on a standard of whether it conforms to the harmony of external design and location in re-

lation to surrounding structures, such a standard, per se, is not ambiguous and, in proper circumstances, it is enforceable, provided that the authority is exercised reasonably within the framework of the covenant purposes. Such rule is to be applied on a case-by-case basis.

We conclude that although the standards are general and broad, they do conform to the purposes of the declaration for the benefit of all owners, they were neither ambiguous nor vague, and they were not contrary to public policy. Under the circumstances here, the committee had the power to act. Did it do so reasonably?

The record shows that the fence extended to a point within 4 to 5 feet from the sidewalk; it prevented some visibility by other owners; it was described variously as an eyesore, ugly, prominent, and imposing; and that the 6-foot by 5-foot area at the rear of the house which excluded the utility box was an eyesore resembling a garbage unit, causing a mowing problem and a neighborhood character change. Plaintiffs' conditional approval was reasonable and enforceable under the facts and circumstances of this case.

AFFIRMED.