0558

PALMETTO DUNES RESORT, a DIVISION OF GREENWOOD DEVEL-
OPMENT CORPORATION, Respondent, v. George F. BROWN, Appellant.

(336 S. E. (2d) 15)

Court of Appeals

*James M. Herring* and *Curtis L. Coltrane,* of *Herring & Meyer,* Hilton Head Island, *for appellant.*

*Joseph R. Barker,* of *Bethea, Jordan & Griffin,* Hilton Head Island, *for respondent.*

Heard May 27, 1985.

Decided Oct. 3, 1985.

SANDERS, Chief Judge:

Respondent Palmetto Dunes Resort sued appellant George F. Brown seeking an injunction prohibiting him from constructing a house on a lot which he owned in a subdivision it had developed. The trial court granted the injunction. We affirm.

Palmetto Dunes developed a residential and resort subdivision on Hilton Head Island. It recorded an instrument containing covenants that restricted certain tracts designated as "Limited Residential" areas. The covenant central to this appeal provides that no building may be constructed upon any lot without Palmetto Dunes' written approval of the building plans and the building location plans, and accords Palmetto Dunes the discretion to disapprove plans for "purely aesthetic considerations."

Palmetto Dunes also created a nine person committee known as the Architectural Review Board to evaluate the exterior positioning and aesthetics of proposed homes, and to approve or disapprove plans pursuant to the covenant. In addition, Palmetto Dunes published a document entitled *Policy, Procedures and Building Guidelines to Follow When Building in Palmetto Dunes Resort*, which describes the approval process and the operation of the Board. The preamble of this document explains that the restrictive covenants were established to "assure and preserve certain high standards of aesthetics and materials ... and to create certain procedures to enable the community to permanently control the quality of its neighborhoods."

The document goes on to provide that the Board is concerned with "all elements of aesthetics," and specifies the "major considerations" to be: "(1) how the house will look to the neighbors (2) color of stain (3) roof line (4) window treatments and exposure (5) general harmony with area and natural surroundings (6) landscaping plans."

The procedures described in the document require an owner to submit an "Application for Residential Construction" along with a "site plan" and "elevation drawing" to the Board. The document admonishes that the Board "often withholds final approval and makes suggestions for improvements that [its] experience [has] shown to be wise."

In December 1980, Brown purchased an unimproved lot subject to the restrictive covenants discussed above on which he intended to build his personal residence. He was familiar with the "policy, procedures and building guidelines" as published by Palmetto Dunes. In February 1981, he filed an application for approval of construction along with proposed building and site plans. The Board reviewed the application and refused to approve the plans. The minutes of the Board's meeting state: "[Brown's] house is rejected due to aesthetics and the uniform opinion of the Board is that the finished product does not represent the quality we are striving for." The chairman of the Board informed Brown by letter that, although other matters concerning the plans were discussed, the general reason for the rejection "was on the basis of aesthetics." The chairman suggested that Brown work on the plans to make them more "pleasing and acceptable."

At the next meeting of the Board, in March 1981, Brown appeared personally to present proposed "cosmetic" changes to make the plans acceptable, such as landscaping alternatives and the installation of dormer windows in the roof over the garage entrance. The Board continued to find the plans unacceptable. The minutes from the meeting state: "It was the unanimous decision of those present that the house is still unapprovable. The garage front and roofline overpower the house entirely too much."

By a second letter, the chairman of the Board informed Brown of its decision that: "The house is still unacceptable to the Board — basically because the garage simply overpowers the house, both the front elevation and the roof line."

Shortly thereafter, Brown's lot was discovered with trees marked for cutting and with stakes placed as if construction was imminent. On March 16, 1981, Palmetto Dunes sought and obtained a temporary order restraining Brown from commencing construction on the lot. Brown then agreed not to attempt construction until there was a final adjudication of the dispute, and the trial judge issued a temporary injunction *pendente lite.*

The hearing on Palmetto Dunes' suit for a permanent injunction was held in February 1983. Brown defended on the primary grounds: (1) that the language in the covenant allowing Palmetto Dunes to refuse approval for aesthetic reasons was unenforceable as a matter of law; and (2) that even if the provision was otherwise enforceable, it should not be enforced in his case because Palmetto Dunes exercised its authority to disapprove plans in an unreasonable manner. The trial judge granted Palmetto Dunes its requested relief, and this appeal followed.

## I

Although Brown accepts the concept of requiring approval of plans before construction, he challenges the validity of the covenant here on the ground that it lacks objective standards to guide the Board in its approval or disapproval of plans.[1] Specifically, he argues that the provision allowing

---

[1] Brown does not contest that aspect of the covenant which requires the approval of plans before construction. He acknowledges that such covenants

disapproval for "purely aesthetic considerations" is vague and ambiguous, thereby enabling Palmetto Dunes to be arbitrary in its decisions.

Rejecting similar arguments, courts have upheld covenants that provide *no* criteria to guide the approving authority in deciding upon the suitability of proposed construction. *See Rhue v. Cheyenne Homes, Inc.*, 168 Colo. 6, 449 P. (2d) 361 (1969); *Hannula v. Hacienda Homes, Inc.*, 34 Cal. (2d) 442, 211 P. (2d) 302, 19 A. L. R. (2d) 1268 (1949); *Kirkley v. Seipelt*, 212 Md. 127, 128 A. (2d) 430 (1957). Other courts confronted with similar arguments have upheld covenants whose criteria for approval can hardly be said to be more specific than the "aesthetic considerations" criterion involved here. *See Snowmass American Corp. v. Schoenheit*, 524 P. (2d) 645 (Colo. App. 1974) (stated purpose of all covenants was to establish and maintain mountain residential area "of the highest possible quality" and protect its "value, desirability and attractiveness"); *Winslette v. Keeler*, 220 Ga. 100, 137 S. E. (2d) 288 (1964) (covenant required building to be in "conformity and harmony of external design and general quality with the existing standards of the neighborhood"); *Normandy Square Association, Inc. v. Ells,*

---

encumbering residential subdivisions as part of a uniform plan of development have been generally sustained. *See* Annot., 40 A. L. R. (3d) 864 (1971). Moreover, he indicated at trial that he wanted the Board to continue functioning. He acknowledged that Palmetto Dunes is a high quality, well-planned development and that the Board is "essential." While not necessary to our decision, we note the holdings of other courts that such covenants are a proper means to assure conformance of proposed structures with the design and development of a subdivision so as to not detract from its appearance and thereby enhance and maintain property values. *See Rhue v. Cheyenne Homes, Inc.*, 168 Colo. 6, 449 P. (2d) 361 (1969); *Kirkley v. Seipelt*, 212 Md. 127, 128 A. (2d) 430 (1957); *Jones v. Northwest Real Estate Co.*, 149 Md. 271, 131 A. 446 (1925). Covenants requiring consent to construction have been involved in cases before our Supreme Court. *See Baron v. Knohl*, 282 S. C. 21, 316 S. E. (2d) 674 (1984); *Circle Square Co. v. Atlantis Development Co.*, 267 S. C. 618, 230 S. E. (2d) 704 (1976). Although the validity of the covenants requiring consent to build was not questioned in those appeals, in *Circle Square* the court remarked on the effect of restrictive covenants generally on the development of Hilton Head Island:

> Hilton Head Island has been developed as a pleasing and appealing resort and retirement community, and the success of the Island's development is due in no small part to careful planning of development and enforcement of that planning through restrictive covenants.

267 S. C. at 630, 230 S. E. (2d) at 709.

213 Neb. 60, 327 N.W. (2d) 101 (1982) (covenant required plans to be approved "as to the harmony of external design and location in relation to the surrounding structures and topography"); *Syrian Antiochian Orthodox Archdiocese v. Palisades Associates*, 110 N.J. Super. 34, 264 A. (2d) 257 (1970) (covenant allowed disapproval of plans "which are not suitable or desirable in [grantor's] opinion").

Our Supreme Court has held that to be valid and enforceable a restrictive covenant must, among other things, "not be too indefinite." *Vickery v. Powell*, 267 S. C. 23, 28, 225 S. E. (2d) 856, 858 (1976). "Restrictive covenants are contractual in nature," so that the paramount rule of construction is to ascertain and give effect to the intent of the parties as determined from the whole document. *Hoffman v. Cohen*, 262 S. C. 71, 75, 202 S. E. (2d) 363, 365 (1974); *Easterby v. Heilbron*, 26 S. C. L. (1 McMul.) 462 (1840).

Applying these principles, we find the "aesthetic considerations" clause is not indefinite. Its settled intent, viewed in relation to the entire document, is to vest in Palmetto Dunes the authority to disapprove plans based upon its judgment of their aesthetic suitability within Palmetto Dunes Resort. Brown displayed his understanding of this by proposing to make cosmetic changes to the house following the initial rejection. The parties voluntarily bound themselves to this arrangement, which they had the right to do. *See Winslette v. Keeler*, 220 Ga. 100, 137 S. E. (2d) 288; *Kirkley v. Seipelt*, 212 Md. 127, 128 A. (2d) 430.

Brown urges that the phrase "aesthetic considerations" is ambiguous so that we must apply the rule of construction that requires ambiguities in a restrictive covenant to be strictly construed against the party seeking to enforce it. *See Donald E. Baltz, Inc. v. R. V. Chandler and Co.*, 248 S. C. 484, 151 S. E. (2d) 441 (1966). We conclude, however, that this rule is not applicable here. "[T]his rule of strict construction should not be applied so as to defeat the plain and obvious purpose of the instrument." *Davey v. Artistic Builders, Inc.*, 263 S. C. 431, 436, 211 S. E. (2d) 235, 237 (1975).

The covenant, by making no attempt to set forth objective "aesthetic considerations," implicitly recognizes, as do we, that it is impossible to establish absolute standards to guide

a judgment of taste.[2] But this does not compel the conclusion that the covenant is ambiguous. We agree with the trial judge that although people may reasonably differ as to whether a house is aesthetically appropriate, the covenant is unambiguous in leaving this solitary judgment to Palmetto Dunes. The plain and obvious purpose of the convenant is to vest this discretion in Palmetto Dunes, which is constrained only to exercise its judgment reasonably and in good faith. *See Kirkley v. Seipelt,* 212 Md. 127, 128 A. (2d) 430.

## II

We next consider whether the trial judge correctly ruled that Palmetto Dunes reasonably and in good faith disapproved Brown's plans. This being an action in equity tried by a single judge, we may decide whether the evidence supports this factual finding based upon our own view of the preponderance of the evidence. *See Mims v. Edgefield County Water and Sewer Authority,* 278 S. C. 554, 299 S. E. (2d) 484 (1983); *Townes Associates, Ltd. v. City of Greenville,* 266 S. C. 81, 221 S. E. (2d) 773 (1976) (dictum).

The Board's formally stated reason for disapproval was that the garage "overpowers" the house. The members of the Board who testified at trial expressed their dissatisfaction

---

[2] Great minds have struggled for centuries to define "aesthetic considerations." In the tradition of Western thought, three writers have provided guidance in the language of common speech. One is the theologian, St. Thomas Aquinas. The second is Immanuel Kant, the most significant philosopher since Aristotle and Plato. The third is Mortimer J. Adler, Chairman of the Board of Editors for the *Encyclopedia Britannica.* In the thirteenth century, Aquinas made a stab at defining beauty: "Beauty relates to the knowing power, for beautiful things are those which please when seen." St. Thomas Aquinas, *Summa Theologica,* I-I, q. 5, art. 4, *reprinted in* 19 *Great Books of the Western World* 26 (R. Hutchins ed. 1952). Five hundred years later, Kant explained more precisely: "The judgment of taste, therefore, is not a cognitive judgment, and so not logical, but is aesthetic — which means that it is one whose determining ground *cannot be other than subjective.*" I. Kant, *The Critique of Judgment* 41 (Judge J. C. Meredith trans. 1952). More recently, Adler agreed: "In the presence of the most eloquent statements about beauty, we are left speechless — speechless in the sense that we cannot find other words for expressing what we think or hope we understand." M. Adler, *Six Great Ideas* 103-04 (1981).

The law, in all its majesty, cannot compel the definition of the indefinable. We reject the alternative of holding that aesthetic considerations have no place in restrictive covenants.

with the house in consistent terms. These witnesses, who were sequestered, testified variously that: the garage was proportionately too big for the house; the proposed construction "looked like . . . a house with a garage and a little piece of it was residential area"; the house "just looked like too much garage"; the "garage looked larger than the house [and] gave . . . the feeling that the house was tacked onto the garage"; the plans looked "like there's a garage with a house added to it rather than a house with a garage added to it"; the garage was "predominant" over the house, the "house looked like a large, two-story garage with a small house appended to it."

These comments aptly describe the frontal appearance of the house. From the front, the house appears to be apportioned neatly into halves. The two-car garage appears to comprise one of the halves, and a residential area the other. The roof above the garage extends very noticeably higher than the roof over the other half of the house. These features give the garage, as articulated by the Board, its overpowering effect.

The Board's reason for disapproval for "aesthetic considerations" must bear a reasonable relation to the other buildings or general plan of development. *See Jones v. Northwest Real Estate Co.*, 149 Md. 271, 131 A. 446 (1925). Under the covenant, the Board had the right to disapprove proposed construction that would tend to mar the general appearance of Palmetto Dunes subdivision and thus diminish the overall quality of the development. Upon a thorough review of the testimony and documentary evidence, we find that the Board's reasons for disapproval bear a sufficient relation to the general plan of development to be sustainable.

Brown contends further that the Board acted arbitrarily in disapproving his plans because it had previously approved construction of two houses similar to his proposed house. He contends that because the Board presumably found these houses aesthetically suitable, it acted arbitrarily in finding his unsuitable.

Even though the plans for both of these houses were derived from the same plans Brown submitted, the plans as approved were neither identical to Brown's plans, nor to

each other. For example, the garage entrance for one house was moved from the front to the side of the house. The other house appears to have considerably more living space than Brown's plans show, and its garage also is situated differently in relation to the rest of the house.

Despite their approval of these two similar plans, the Board members testified they were not fully satisfied with the houses once built. There was considerable testimony that, based upon their experience with these houses, they were disinclined to approve other houses based upon similar plans. In explaining their approval of these two houses, some Board members observed that artists' renderings of homes, upon which the Board relies heavily in making its decision, are at times "flattering," and at other times "outright deceiving," so that a house as built can look "completely different" from the drawings. The Board members indicated that evaluating plans and evaluating houses as actually constructed are far different tasks.

The preponderance of the evidence does not justify a finding that the Board acted unreasonably in disapproving Brown's plans, even though it previously had approved similar plans. To the contrary, the evidence shows that the Board carefully followed the "policy, procedures and building guidelines" published by Palmetto Dunes, and administered the architectural controls professionally and fairly throughout, using sound judgment and discretion. The Board's approval of similar although not identical plans that were aesthetically unsuitable once realized, did not thereafter oblige it to approve similarly unacceptable homes. The Board's disapproval of Brown's plans and prior approval of two other similar plans were based on well-reasoned value judgments under the circumstances in each situation, rather than arbitrary and capricious whims.

In a last attempt to show that the disapproval was unreasonable, Brown asserts that the true, unexpressed reason for the rejection was not for aesthetic considerations, but rather because the house was of prefabricated construction. Through circumstantial evidence, Brown attempted to show that the Board had adopted a policy banning all future prefabricated construction. We agree with the trial judge that Brown did not present sufficient evidence to prove this alleged ulterior motive.

The Board members testified uniformly that while they were aware that Brown's proposed house was of prefabricated construction, this was not a factor in the decision to disapprove the plans. The trial judge made a special finding that he was "impressed" with the Board members' credibility. "[C]onsideration [of credibility] must be left to the trial judge who saw and heard the witnesses testify." *Rogers v. Nation*, 284 S. C. 330, 326 S. E. (2d) 182, 184-185 (Ct. App. 1985). The circumstantial evidence Brown presented falls short of rebutting the direct evidence in the form of testimony by the Board members, and fails to show a phobic attitude by the Board towards prefabricated construction.

### III

We now snap shut this opinion by briefly considering Brown's various remaining miscellaneous exceptions to the trial judge's rulings and findings of fact.[3]

### A

Brown asserts the trial judge erred in describing his burden of proof in challenging the restrictive covenant as "heavy." The trial judge's view of the applicable burden is consonant with legal precedent. *See Dunlap v. Beaty*, 239 S. C. 196, 122 S. E. (2d) 9 (1961). In any event, based on our own view of the evidence, we find that Brown failed to meet his burden under the simple preponderance of the evidence.

### B

Brown contests the following factual findings of the trial judge: (1) that the Board's first rejection of Brown's plan was not absolute; (2) that Brown did not avail himself of the procedure allowing an appeal from the

---

[3] By way of explanation to the reader, who may have concluded that this opinion is already too long, we call attention to several aspects of this case as it reaches us. The trial judge's order is 41 pages long. Brown takes 30 exceptions to his rulings and findings of fact. Palmetto Dunes responds with 5 additional sustaining grounds. The Transcript of Record is contained in 4 separate volumes. The written arguments of the parties run more than 250 pages. (Paradoxically, the parties persist in characterizing these as "Briefs.")

Board's decision to the president of Palmetto Dunes; and (3) that after this suit was commenced Brown, who is a real estate developer in his own right, adopted similar restrictive covenants for a resort community he is developing on Hilton Head Island. We note first that even if we were to agree that these findings are against the preponderance of the evidence, the result we reach today would not be affected. *See August Wright Co. v. Hodges*, 87 S. C. 560, 70 S. E. 316 (1911). The trial judge did not, nor do we, draw any conclusions adverse to Brown based upon these findings. In any event, we are convinced that the preponderance of the evidence supports these findings.

## C

Brown's next contentions are based on two remarks of the trial judge made during argument.

At one point, the trial judge remarked that in rendering his decision he would "disregard the policy." In his order, the trial judge referred several times to the document published by Palmetto Dunes entitled *Policy, Procedures and Building Guidelines to Follow When Building in Palmetto Dunes Resort*, which was admitted into evidence without objection. Brown argues the judge erred in referring to this document in his order because by his comment he stated he would not consider it. Contrary to Brown's assertions, we find that the judge's remark was not a declaration that he would not consider the document. Rather, the remark was made in the context of a legal colloquy between the judge and counsel concerning a hypothetical "policy" against prefabricated construction. It was by no means a final ruling. Even assuming Brown were correct in his interpretation of the comment, the trial judge would not thereby bind himself to a particular position, any more than the judges of an appellate court are bound to a position by comments made during appellate oral argument.

At another point, the trial judge remarked that he would consider over-repetition of plans as a proper ground for disapproval. Brown argues that this was error. Similarly, we hold that the judge was not bound by this remark. Further, the judge's written order did not embody this reasoning, but even if it had, we are not convinced that this would be error.

## D

Brown further contends the trial judge erred in preventing his counsel from asking a question on cross-examination that the judge concluded demanded a hearsay response. We find no abuse of discretion in the trial judge's control over the reception of evidence. *See McGaha v. Mosley,* 283 S. C. 268, 322 S. E. (2d) 461 (Ct. App. 1984); *Timmons v. McCutcheon,* 284 S. C. 4, 324 S. E. (2d) 319 (Ct. App. 1984). Furthermore, the evidence defense counsel sought to elicit, even if admitted, would not have affected the result at trial or on appeal. *See Register v. Life Ins. Co. of Virginia,* 213 S. C. 508, 50 S. E. (2d) 197 (1948).

## E

Brown also argues that the trial judge erred in drawing an analogy between restrictive covenants and zoning ordinances. While the legal principles on restrictive covenants and zoning ordinances are not entirely analogous, the judge's analogy was limited, and the legal reasoning he applied does not require reversal.

## F

By another exception Brown notes that, among the many decisions cited in the judge's forty-one-page order, one was later reversed. This exception is manifestly without merit. *See* Section 14-8-250, Code of Laws of South Carolina, 1976, as amended. (This court "need not address a point which is manifestly without merit.")

## G

Brown's remaining exception relating to the failure of the trial judge to view the subdivision has not been argued in his brief, and therefore is deemed abandoned. *See Cudd v. John Hancock Mutual Life Ins. Co.,* 279 S. C. 623, 310 S. E. (2d) 830 (Ct. App. 1983).

For these reasons, the order of the Circuit Court is

Affirmed.

GARDNER and GOOLSBY, JJ., concur.