Steven PERTZSCH and Doris Pertzsch, Plaintiffs-Respondents,

v.

UPPER OCONOMOWOC LAKE ASSOCIATION, Thomas L.Wavernek, Damian O. Fennig, Donald Fellows and Kenneth E. Millard, Defendants-Appellants.

Court of Appeals

*No. 00–2514. Oral argument July 24, 2001.—Decided September 19, 2001.*

2001 WI App 232

(Also reported in 635 N.W.2d 829.)

On behalf of the defendants-appellants, the cause was submitted on the briefs of and oral argument by *Curtis A. Paulsen* of *Whyte Hirschboeck Dudek, S.C.* of Milwaukee.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief of *Kathryn Sawyer Gutenkunst* and *Daniel J. Habeck* of *Cramer, Multhauf & Hammes, LLP* of Waukesha. There was oral argument by *Kathryn Sawyer Gutenkunst*.

Before Nettesheim, P.J., Brown and Anderson, JJ.

¶ 1. BROWN, J.   The Upper Oconomowoc Lake Association appeals from an order reversing the decision of the Association's Architectural Control Committee to deny the request of Steven and Doris Pertzsch to build a lakeside boathouse. The court reasoned that the Committee's reliance on the fact that no other lakeside boathouse existed rendered its decision arbitrary and capricious in light of the express terms of the restrictive covenant allowing boathouses. We affirm.

¶ 2.   On June 1, 1999, the Pertzsches purchased property on Upper Oconomowoc Lake. As required in the controlling covenants, the Pertzsches provided the Committee with the plans and specifications for the construction of a home and a detached, lakeside boathouse and requested the necessary consent for the construction of both buildings. The Committee ap-

221

proved the Pertzsches' house plan but denied their request for a lakeside boathouse.[1]

¶ 3. The covenants controlling the Committee's decision are contained in an agreement executed in 1961. The agreement provided for the creation of the Committee and granted it certain powers, duties and responsibilities relating to the construction of buildings and other structures. These powers and duties stem from the specific requirement that all construction plans and specifications be approved by the Committee. The paragraphs relevant to this dispute state in part:

(1)    LAND USE AND BUILDING TYPE:  No lot shall be used, except for residential purposes. No building shall be erected, altered, placed, or permitted to remain on any lot other than one detached single family dwelling not to exceed two stories in height and a private garage for not more than three cars, except that a boat house may be permitted with consent of the Architectural Control Committee.

(2)    ARCHITECTURAL CONTROL:  No building shall be erected, placed, or altered on any lot until the construction plans and specifications and a plan showing the location of the structure have been approved by the Architectural Control Committee as to quality of workmanship and materials, harmony of external design with existing structures, and as to location with respect to topograph and finish grade elevation and setback, front, back and side. No fence or wall shall be erected, placed or altered on any lot

---

[1] The letter approving the house plan and denying the boathouse was signed by the Committee's three volunteer members, Thomas L. Wavernek, Damian O. Fennig, and Donald Fellows, who are also defendants in this action. The fourth named defendant, Kenneth E. Millard, intervened as a party with a personal interest in the matter

nearer to any street than the minimum building setback line unless similarly approved.

. . . .

(5)    DWELLING LOCATION: No dwelling shall be located on any lot nearer to the front lot line or nearer to the side street line or nearer to the lakeshore, than the minimum building setback lines shown on the recorded plat and in any event, no dwelling shall be located on any lot nearer than fifty (50) feet to the lakeshore or nearer than fifty (50) feet to the front lot line, or nearer than thirty-five (35) feet to any side street line. No building shall be located nearer than ten (10) feet to an interior lot line. No dwelling shall be located on any interior lot nearer than thirty-five (35) feet to the rear lot line. For the purpose of this covenant, eaves, steps, and open porches shall not be considered as part of a building, provided, however, that this shall not be construed to permit any portion of a building on a lot to encroach upon another lot. That prior to commencement of structures of any kind, the Architectural Control Committee must approve all setback lines and all construction in writing. Said Committee is further granted control over construction of piers and any other structures extending into or on the water and written consent must be approved prior to commencement of construction as to length, width, and location.

¶ 4.   While the record shows that the Committee has previously approved many boat storage structures attached to a garage or home, it has never before been presented with a plan to construct a detached, lakeside boathouse.

¶ 5.   At a hearing on the parties' cross-motions for summary judgment, the Association argued that paragraph one of the agreement, by its express terms, bars detached boathouses, allowing only structures that are

affixed to a garage. The trial court rejected this interpretation of paragraph one, observing that it clearly carves out an exception which permits a boathouse and that the Committee's refusal to allow the Pertzsches to build a boathouse simply because it would be the first one was arbitrary and capricious.

¶ 6. On appeal, the Association has set aside its assertion that the agreement prohibits construction of all detached boathouses. In its brief-in-chief, the Association now argues that the Committee's denial of the boathouse was based upon, and in conformance with, the standards set forth in paragraph two of the agreement. During oral argument before this court, the Association took yet another position on the issue, arguing that pursuant to paragraph one, the Committee can exercise its discretion to approve or deny requests for a boathouse without regard to the specific standards set forth in paragraph two. In other words, the Association argues that paragraph one is a "stand alone" provision that authorizes the Committee to make determinations regarding boathouses without regard to quality of workmanship and materials, harmony of external design with existing structures, and location with respect to topography, elevation, setback and the like.

■

¶ 7. We begin by identifying the standard of review. In their complaint, the Pertzsches sought a declaration that their request to construct a boathouse be granted for the reason that it was in keeping with the agreement. They also sought a declaration limiting the Committee's exercise of authority as it is contained in the agreement. The parties filed cross-motions for summary judgment on the basis that no disputed issues of material fact exist. We review a motion for summary

judgment using the same methodology as the trial court. *M&I First Nat'l Bank v. Episcopal Homes Mgmt., Inc.*, 195 Wis. 2d 485, 496, 536 N.W.2d 175 (Ct. App. 1995). Although summary judgment presents a question of law which we review de novo, we nonetheless value a trial court's decision on such a question. *Id.* at 497. Furthermore, this case requires us to construe the covenants in the agreement to determine whether the Committee had authority to deny the boathouse for the reasons stated in its letter. The interpretation of restrictive covenants is a question of law. *Bubholz v. Dane County*, 159 Wis. 2d 284, 291–92, 464 N.W.2d 67 (Ct. App. 1990).

■

¶ 8. We are mindful that Wisconsin public policy favors the free and unrestricted use of property. *Dodge v. Carauna*, 127 Wis. 2d 62, 65, 377 N.W.2d 208 (Ct. App. 1985). Consequently, restrictions contained in deeds must be strictly construed to favor the free use of property; such restrictions therefore must be expressed in clear and unambiguous language. *Id.*

¶ 9. As an initial matter, we accept the concession of the Association that the agreement allows detached, lakeside boathouses subject to the consent of the Committee. We agree with the trial court that the plain language of paragraph one clearly carves out an exception to allow for such structures: "No building shall be erected, altered, placed, or permitted to remain on any lot other than one detached single family dwelling . . . and a private garage for not more than three cars, *except that a boat house may be permitted with consent of the Architectural Control Committee.*" (Emphasis added.) The Association's original argument that this language created an exception only for attached or integrated boathouses is without merit, especially in

light of paragraph four which explicitly requires garages to be attached to the home but makes no reference to a boathouse.[2]

¶ 10. We now address the Association's argument that paragraph one is a "stand alone" provision that contains a standardless consent-to-construction covenant. We also find this argument to be completely without merit. If the Association were correct, then paragraph two would be superfluous. Alternatively, the Association posits that the criteria in paragraph two apply only to residences and garages, but not to boathouses. Again, this contravenes the plain language of the agreement that establishes in the first paragraph which buildings may be erected (single family dwellings, garages and boathouses) and establishes in the second paragraph the standards that the Committee shall adhere to in approving plans brought before it. There is no indication whatsoever in the agreement that the Committee's discretion with respect to residences and garages is limited to the specific standards in paragraph two, but its discretion with respect to boathouses is unfettered. Instead, paragraph two refers generally to a "building," and requires that all plans for a "building" be submitted to the Committee for approval "as to quality of workmanship and materials, harmony of external design with existing structures, and as to location with respect to topograph and finish grade elevation and setback, front, back and side." Therefore, we conclude that under the explicit terms of the covenants, the Committee is authorized to approve or deny

[2] Paragraph four of the agreement states: "A minimum of a two car garage must be constructed for each residence and said two car garage must attach or touch upon some portion or part of said residence."

a request for a boathouse exclusively on the basis of those standards set forth in paragraph two.[3]

¶ 11.   We now turn to the central issue in this case, which is whether the Committee properly applied the standards in paragraph two of the agreement when it denied the Pertzsches' request for a boathouse as stated in this excerpt of the letter:

> The grounds for said refusal include but are not limited to: its failure to conform to existing structures then and there existing; for not being in harmony of external design with existing structures with respect to topograph elevation and setback.
>
> Whereas the covenants and restrictions obligate us to evaluate the impact on the entire subdivision, and

---

[3] Because we reject the argument that the covenants contain no specific standard of approval for boathouses, we also reject the Association's reliance on *Dodge v. Carauna*, 127 Wis. 2d 62, 377 N.W.2d 208 (Ct. App. 1985). In that case, we held that where a common grantor reserves the right to approve construction of a building by arbitrary standards, the exercise of that right must be reasonable. *Id.* at 66–67. We stated that a finding of reasonableness would depend on the developer's intent and objectives and the relation of the structure to its surroundings and to other buildings in the subdivision. *Id.* at 67. The Association asks us to remand this case for a finding on these evidentiary issues. However, because the standards of approval in this case are not arbitrary, but are clear and specific, we are precluded from inquiring into the developer's intent or into any other evidentiary matters outside the four corners of the agreement. *See Zinda v. Krause*, 191 Wis. 2d 154, 171, 528 N.W.2d 55 (Ct. App. 1995) (where the language of the covenant expresses a purpose contrary to the developer's subjective state of mind, the language of the covenant controls); *Hall v. Church of the Open Bible*, 4 Wis. 2d 246, 248, 89 N.W.2d 798 (1958) (parol evidence is not admissible to establish any intent other than that clearly expressed in the instrument itself).

whereas all of the other lots have been developed without permanent raised structures within fifty to seventy feet of the water, we find the boathouse to be nonconforming to the intent of harmony in setback, topography, and structure, therefore, we do not find that this exception would be in the interest of the riparian owners.

¶ 12. Under paragraph two of the agreement, the first criterion the Committee must consider is quality of workmanship and materials. The denial letter does not state that the quality of workmanship and materials is unacceptable. Therefore, we assume that the Committee had no objection to the boathouse based on this criterion.

¶ 13. The second criterion is harmony of external design with existing structures. The Committee construed this standard to mean that it can deny a detached boathouse because it is out of character with the existing structures in the community. Under this interpretation of the standard, the plans for the boathouse fail because there are no other lakeside boathouses. This, we believe, is what the Committee intended to communicate by its letter when it stated, "whereas all of the other lots have been developed without permanent raised structures within fifty to seventy feet of the water."

¶ 14. However, the Committee misconstrues its mandate under this criterion. We believe the key word is "design." If the boathouse plans depicted an unacceptable architectural design, such as a Frank Lloyd Wright type of structure amongst a community of tudor-style structures, then the Committee could deny the plans for failing to be in harmony with external design. *See, e.g., Town & Country Estates Ass'n v. Slater,* 740 P.2d 668, 671 (Mont. 1987) ("harmony of external design" too

vague to be enforced where development was a cacophony of architectural styles). But this criterion does not authorize the Committee to deny a boathouse because no one else has a similar structure. In order for the Committee to deny the boathouse within the terms of this criterion, it would have to make a decision based on the specific external design of the boathouse compared to the design of other existing structures. Again, the letter is silent with respect to this matter and therefore we assume the Committee had no objection to the architectural style of the boathouse.

¶ 15. The third criterion which the Committee must consider is location. The agreement is very specific as to what this criterion entails: "location with respect to topograph[4] and finish grade elevation and setback, front, back and side." This means that the Committee can reject a building design or plan if the Committee does not approve of the configuration of its surface features with respect to its surroundings. For example, the Committee would be authorized to deny a boathouse if it was too high or improperly positioned on the lot relative to its surroundings. The letter makes clear, however, that the Committee mistakenly believed it was authorized under this standard to reject the boathouse because it was within fifty to seventy feet of the lake. The explicit language of paragraph five states that this restriction applies only to dwellings: "No dwelling shall be located on any lot nearer than fifty (50) feet to the lakeshore." To assume that the term "dwelling" includes a boathouse strains the language

---

[4] Topography refers to "the configuration of a surface including its relief and the position of its natural and man-made features" or "the physical or natural features of an object or entity and their structural relationships." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2411 (1993).

beyond its logical meaning. Later in this paragraph it states: "No building shall be located nearer than ten (10) feet to an interior lot line." Clearly, this latter sentence would include the boathouse while the former sentence would not.

¶ 16. To summarize, we find that the grounds for refusal expressed in the denial letter show that the Committee misconstrued its mandate. The letter evinces the Committee's mistaken belief that it had authority to refuse all detached boathouses. However, the fact that no other resident has constructed a detached boathouse is not a proper criterion under the covenants to refuse the Pertzsches' request. The Committee has no authorization to use the standards in the covenant to effectuate an express prohibition of detached, lakeside boathouses when the agreement expressly allows such structures to be built. While the Committee can control construction of boathouses using the criteria in paragraph two, it cannot ban them entirely.

¶ 17. Nevertheless, we are sympathetic with the thrust of the Association's objection, which is that the Pertzsches' boathouse is not in harmony with the general plan or scheme that has evolved in the Upper Oconomowoc Lake community. We are also cognizant of the holding in *Zinda v. Krause*, 191 Wis. 2d 154, 167, 528 N.W.2d 55 (Ct. App. 1995), that "where the purpose of a restrictive covenant may be clearly discerned from the terms of the covenant, the covenant is enforceable against any activity that contravenes that purpose." We cannot apply *Zinda* in this case, however, because we, like the Association, are constrained by the language of the agreement which allows boathouses to be constructed. Therefore, we must apply the rule that has

long been the law in Wisconsin[5] that deed restrictions must be strictly construed to favor unencumbered and free use of property and any derogation of such use must be expressed in clear, unambiguous and peremptory terms. *Crowley v. Knapp*, 94 Wis. 2d 421, 434–35, 288 N.W.2d 815 (1980). Because we conclude that the Committee was not authorized to refuse the Pertzsches' request for a boathouse for the reasons stated in the denial letter, we affirm the order of the trial court.

*By the Court.*—Order affirmed.

¶ 18. ANDERSON, J. (*concurring*). I join in the result because we are bound by precedent. *Cook v. Cook*, 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997).

¶ 19. The lead opinion correctly points out that our decision is driven by Wisconsin's public policy favoring the free and unrestricted use of property. Majority at ¶ 17. This public policy has a long history in Wisconsin and played an important role in the economic development of this state. Since statehood, the demands of a burgeoning economy and population necessitated flexible land use. Without a public policy favoring the free and unrestricted use of land, changes

---

[5] We acknowledge that some jurisdictions now question whether rules of strict construction should apply where the meaning of a subdivision's protective covenants are at issue and the dispute is among homeowners. *See Riss v. Angel*, 934 P.2d 669, 675–76 (Wash. 1997). These jurisdictions view restrictive covenants as valuable land use planning devices, *Joslin v. Pine River Dev. Corp.*, 367 A.2d 599, 601 (N.H. 1976), and liberally construe restrictive covenants to give effect to the intent or purpose of the covenants rather than free use of the land. *Riss*, 934 P.2d at 676. However, in this case, the agreement unambiguously manifests an intent to allow boathouses, and we do not believe even a liberal construction of the covenants can overcome this clear expression.

in the use of land required to keep the economy growing would not have been possible. *See* Casey J. Little, Note & Comment, *Riss v. Angel: Washington Remodels the Framework for Interpreting Restrictive Covenants,* 73 WASH. L. REV. 433, 449 (1998). The development of commercial and manufacturing areas in our urban areas would not have been possible if restrictive covenants banned the construction of tanneries, liveries, slaughterhouses or breweries.

¶ 20.  The public policy favoring the free and unrestricted use of real property was dominant in the United States throughout the nineteenth century; even governments imposed few land use restrictions. *See* KENNETH H. YOUNG, 1 ANDERSON'S AMERICAN LAW OF ZONING § 1.02 (4th ed. 1996). But, facing overcrowding, blight and dislocation of use, New York adopted the first comprehensive zoning ordinance in 1916. *Id.* Today, zoning ordinances' restrictions on the free use of land are generally accepted for the purpose of promoting the public health, safety and general welfare. *Willow Creek Ranch v. Town of Shelby,* 224 Wis. 2d 269, 276–77, 592 N.W.2d 15 (Ct. App. 1998), *aff'd,* 2000 WI 56, 235 Wis. 2d 409, 611 N.W.2d 693.

¶ 21.  While zoning has been considered a legitimate restriction on the private use of real property, restrictive covenants imposed upon real property by owners and developers have not enjoyed the same status. As the lead opinion makes abundantly clear, Wisconsin disfavors privately imposed restrictions on the use of land. I believe that the time has come to abandon an out-of-date public policy in favor of a public policy that recognizes:

> [H]ousing today is ordinarily developed by subdividers, who, through the use of restrictive covenants, guarantee to the homeowner that his house will be protected

against adjacent construction which will impair its value, and that a general plan of construction will be followed. Restrictions enhance the value of the subdivision property and form an inducement for purchasers to buy lots within the subdivision. A covenant requiring submission of plans and prior approval before construction is one method by which guarantees of value and of adherence to a general scheme of development can be accomplished and maintained.

*Davis v. Huey*, 620 S.W.2d 561, 565 (Tex. 1981) (citations omitted).

¶ 22. The public policy favoring the free use of land has been abandoned in RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 4 (Introductory Note) (1998):

> The general principles governing servitude interpretation . . . adopt the model of interpretation used in contract law and displace the older interpretive model used in servitudes law that emphasized the free use of land, sometimes at the expense of frustrating intent. In adopting this model, this Restatement follows the lead of courts that have recognized the important and useful role servitudes play in modern real-estate development. To the extent that the old canon favoring free use of land remains useful, its function is served in cautioning against finding that a servitude has been created where the parties' intent is unclear . . . and in construing servitudes to avoid violating public policy. . . . It also may play a role in limiting the creation of servitudes that burden fundamental rights . . . and limiting the rulemaking powers of community associations. . . . Aside from those situations, *construing in favor of free use of land should play no role in interpreting modern servitudes*. (Emphasis added.)

¶ 23.  "[T]o ascertain and give effect to the likely intentions and legitimate expectations" of property owners, *id.*, the RESTATEMENT adopts a new principle governing the interpretation of restrictive covenants:

**Interpretation of Servitudes**

(1) A servitude should be interpreted to give effect to the intention of the parties ascertained from the language used in the instrument, or the circumstances surrounding creation of the servitude, and to carry out the purpose for which it was created.

(2) Unless the purpose for which the servitude is created violates public policy, and unless contrary to the intent of the parties, a servitude should be interpreted to avoid violating public policy. Among reasonable interpretations, that which is more consonant with public policy should be preferred.

*Id.*

¶ 24.  The justification for a new principle to guide the interpretation of restrictive covenants is provided in the commentary:

The rule that servitudes should be interpreted to carry out the intent of the parties and the purpose of the intended servitude departs from the often expressed view that servitudes should be narrowly construed to favor the free use of land. It is based in the recognition that servitudes are widely used in modern land development and ordinarily play a valuable role in utilization of land resources. The rule is supported by modern case law.

*Id.* § 4.1 cmt. a.

¶ 25.  When this modern approach is employed by courts to review decisions of an architectural control committee, the question is no longer whether the

234

committee's decision inhibits the free use of land but whether its decision is reasonable.[1] *See* Allen Oshinski, *Restrictive Covenants and Architectural Review: Some Suggested Standards,* 27 J. MARSHALL L. REV. 939, 941 (1994). The RESTATEMENT imposes a duty upon a committee "to act reasonably in the exercise of its discretionary powers including . . . design-control powers." RESTATEMENT (THIRD) OF PROP.: Servitudes § 6.13(1)(c).[2] *See also* Marvin J. Nodiff, *Decision-Making in the Community Association: Do the Old Rules Still Apply?,* 52 J. Mo. B. 141, 147 (1996). In applying the rule of reasonableness, one court places "special emphasis on arriving at an interpretation that protects the homeowners' collective interests." *Riss v. Angel,* 934 P.2d 669, 676 (Wash. 1997).

¶ 26. If I were to apply the modern approach to the decision of the Committee in this case, I would start with the discretion given to the Committee to grant permission to build a detached boathouse. Majority at ¶ 3. In exercising this discretion, the Committee's mandate is to enforce the restrictive covenants in such a manner as to give effect to the intent of the covenants

---

[1] The rule of reasonableness has been applied to decisions of architectural control committees in other jurisdictions. *Riss v. Angel,* 934 P.2d 669, 677 (Wash. 1997); *Palmetto Dunes Resort v. Brown,* 336 S.E.2d 15, 19 (S.C. App. 1985); *Normandy Square Ass'n v. Ells,* 327 N.W.2d 101, 104 (Neb. 1982); *Davis v. Huey,* 620 S.W.2d 561, 565 (Tex. 1981).

[2] The case law and authorities applying the modern approach to interpreting restrictive covenants focus on common-interest communities, such as condominiums, cooperatives and homeowners associations. Casey J. Little, Note & Comment, *Riss v. Angel: Washington Remodels the Framework for Interpreting Restrictive Covenants,* 73 WASH. L. REV. 433, 436 n.18; RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 1.8 (1998).

and to protect the interest of all the homeowners in the subdivision. That there have been no other requests to construct detached boathouses in the subdivision, Majority at ¶ 4, demonstrates the collective interest of the members of the Upper Oconomowoc Lake Association that all boat storage structures be attached to a garage or home. Because the Committee must take into consideration the collective interest of the homeowners, the proposed boathouse's "harmony of external design with existing structures" and "location with respect to topograph," Majority at ¶ 3, it is reasonable for the Committee to decide that the intent of the restrictive covenants is not given effect by permitting the construction of a detached boathouse. *Normandy Square Ass'n v. Ells*, 327 N.W.2d 101, 104 (Neb. 1982) (it was reasonable for an architectural review committee to deny permission to build a fence because it violated the harmony of external design and location in relation to the surrounding structures and topography).

¶ 27. If I could use the modern approach to interpreting restrictive covenants, I would approve the action of the Committee because the proposed detached boathouse changed the neighborhood ambiance, backdrop and setting. The proposed boathouse would be the subdivision's only detached boat storage. These factors furnish an objective, reasonable and nonarbitrary basis for denying permission under the modern approach embodied in the RESTATEMENT.